IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

NATASHA N. CLEMONS, as Personal
Representative of the ESTATE of
RODNEY MITCHELL and on behalf of
CHANNING MITCHELL, SURVIVOR;
and DORIAN GILMER,
    PLAINTIFFS,

v.

HON. THOMAS M. KNIGHT, in both his
official and individual capacity as Sheriff of
Sarasota County,
TROY SASSE, ADAM SHAW, both in their
individual and official capacities,
    DEFENDANTS.

CASE NO.

2: 14 -cV- 312 -FtM-38DNF

U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS, FLORIDA
2014 JUN -6 PM 3: 05
FILED

## COMPAINT FOR DAMAGES

Plaintiffs sue the Defendants, alleging as follows:

### Introduction

1. This is a federal civil rights action on behalf of the decedent, Rodney Mitchell, through his Personal Representative, Natasha N. Clemons, and by Dorian Gilmer who was injured by the same officers.

2. Plaintiff-Decedent Rodney Mitchell and Dorian Gilmer, brings this civil rights action against the Hon. Thomas Knight in both his official and individual capacity as Sheriff of Sarasota County, and individual law enforcement officers Troy Sasse and Adam Shaw involved in causing Mitchell's death and Mr. Gilmer personal injury on June 11, 2012.

3.  Mr. Mitchell died and Mr. Gilmer suffered personal injury under restraint by officers conducting an illegal traffic stops, thereby violating both Mr. Mitchell and Mr. Gilmer's constitutional rights.

4.  This action is brought pursuant to 42 U.S.C. § 1983 for violations of Plaintiffs constitutional rights to be free from unreasonable seizures under the Fourth Amendment of the United States Constitution.

5.  Federal claims of wrongful death and survival are brought against individual officers Troy Sasse and Adam Shaw for use of excessive force by conducting an illegal traffic stop, failure to communicate with the other officer in the field, intentionally or recklessly disengage of firearm without any violent provocation by the Plaintiffs, deploying multiple gunshots over an extended time, and improper physical restraint techniques when conducting a traffic stop.

6.  This unprovoked assault, battery, and restraint were the sole and proximate causes of Mr. Mitchell's death and Mr. Gilmer's personal injuries.

7.  Plaintiffs alleges federal claims against Hon. Thomas Knight based on theories of supervisor and municipal liability for unconstitutional office policies, customs and practices that violated the Plaintiffs' constitutional rights.

8.  Plaintiff-Decedent also brings wrongful death and survival claims under the common law of Florida against Defendant Hon. Thomas Knight pursuant to

the Florida Tort Claims Act under theories of negligence, intentional infliction of emotional distress, in the alternative negligence of infliction of emotional distress, assault, and battery.

9.  Plaintiff-Gilmer also brings claims under the common law of Florida against Defendant Hon. Thomas Knight pursuant to the Florida Tort Claims Act under theories of negligence, intentional infliction of emotional distress, in the alternative negligence infliction of emotional distress, and battery.

## Jurisdiction and Venue

10. The Original "Federal Question" Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 to redress the deprivation, under color of state law, of rights secured to the plaintiffs by the United States Constitution.

11. The Plaintiff's claims for relief are predicated upon 42 U.S.C. § 1983, which authorizes actions to redress the deprivation, under color of state law, of rights, privileges and immunities secured to the plaintiff by the Constitution and laws of the United States and by 42 U.S.C. § 1988.

12. This is an action for damages and attorney fees arising under 42 U.S.C. § 1983 and 1988, and damages arising under the laws of the State of Florida.

13. This action alleges violations of the U.S. Constitution, including violation of the Fourth and Fourteenth Amendments, which forbid the unnecessary and excessive use of force against persons during a seizure or attempted seizure.

14. This action alleges violations of the Florida Statute § 787.02 False Imprisonment, which forbid forcibly, by threat, or secretly confining, abducting, imprisoning, or restraining another person without lawful authority and against her or his will.

15. This Court has original jurisdiction over this action and the parties pursuant to 42 U.S.C. §§ 1983 and 1988; the U.S. Constitution; the provisions in 28 U.S.C. §§ 1331, et. Seq.; and the ancillary jurisdiction of this Court is pursuant to 29 U.S.C. § 1367 for all state claims.

16. State law claims are brought under the provisions of Florida Statute § 768.16 of the Florida Wrongful Death Act and Florida Statute § 768.28, and Florida Statute § 787.02.

17. Such claims arise from a common nucleus of operative facts with violation(s) of 42 U.S.C. § 1983 as set forth above.

18. Venue is appropriate in this Court under 28 U.S.C. § 1391(b)(1) because one or more Defendants are situated within, and under 28 U.S.C. § 1391(b)(2) because all or a substantial part of the wrongful acts complained of occurred within, the Middle District of Florida.

19. The wrongful acts described in this Complaint occurred within the jurisdiction of the United States District Court in and for the Middle District of Florida.

20. At all times material hereto, the acts, omissions, practices, and other conduct of each Defendants were committed within the course and scope of their employment and under the color of state law or local law.

21. All conditions precedent to this lawsuit, if any, have been satisfied or waived.

## Parties

22. Natasha N. Clemons, the mother of Rodney Mitchell, sues as Personal Representative on behalf of the Estate of Rodney Mitchell and on behalf of decedent's only biological son Channing Mitchell, as survivor of Rodney Mitchell. She is a resident of Florida and a citizen of the United States. The deceased, Rodney Mitchell, was a citizen and resident of Florida until his death on June 11, 2012.

23. Dorian Gilmer is a Plaintiff in his own right, at all times pertinent hereto, a resident of Florida and a citizen of the United States.

24. At all times material hereto, Defendant THOMAS KNIGHT, in his capacity as Sheriff of the Sarasota Sheriff's Office in Sarasota County, Florida, and was a "person" subject to legal action under 42 U.S.C § 1983. He is sued in his official capacity. Defendant Hon. Thomas Knight, is an elected constitutional officer, and the final policymaker for Sarasota Sheriff's Office officers. Defendant Hon. Knight employed the two Sheriff's Officers, who shot and killed Mr. Mitchell's, and caused Mr. Dorian Gilmer personal injuries. Defendant Hon. Knight employed the two Sheriff's supervisors, who authorized, directed, and/or ratified the acts of its subordinates and could have prevented Mr. Mitchell's murder and Mr. Dorian Gilmer's injuries but, failed to do so. Defendant Hon. Knight is the supervisor of the Defendants

Sasse and Shaw.   Defendant Hon. Thomas Knight failed to promulgate adequate polices and failed to supervise his subordinates who use unconstitutional levels of force in conducting traffic stops of citizens. Defendant Hon. Thomas Knight was deliberately indifferent in that he knew or should have known of the risk of harm.  He is sued in his official capacity under 42 U.S.C § 1983 law for compensatory and punitive damages. He was at all relevant times acting in the course and scope of his duties as Sheriff of Sarasota Sheriff's Office and under color of law.

25. Defendant Troy Sasse, was at all times pertinent hereto, a Sarasota Sheriff's Office and employed by Defendant Hon. Thomas Knight.  Sergeant Sasse is a supervisor acting within the course and scope of his employment, and was a "person" subject to suit under 42 U.S.C § 1983. He is sued in his individual capacity for compensatory and punitive damages under 42 U.S.C § 1983 only.

26. Defendant Adam Shaw, was at all times pertinent hereto, a Sarasota Sheriff's Office Deputy and employed by Defendant Hon. Thomas Knight, acting within the course and scope of his employment. He is sued in his individual capacity for compensatory and punitive damages under 42 U.S.C § 1983 only.

27. All actions relevant to this suit occurred in Sarasota, Florida. All the above officers, hereinafter "Defendant Sheriff's Officers," were acting under color of law within the course and scope of their employment. At the time of Rodney Mitchell's death and Dorian Gilmer's personal injuries, Defendant

Sheriff's Officers were acting jointly according to a common plan and purpose.

## Common Allegations of Fact

28. At the time of the events complained of, Rodney Mitchell was a 23 year old citizen and resident of Bradenton Florida. He was raised in Sarasota, graduated from Palmetto High School, and from the Eastern New Mexico University with a Bachelor of Arts in 2012. Mr. Mitchell major was education.

29. Mr. Mitchell attended Eastern New Mexico University on a full football scholarship.

30. Mr. Mitchell was a great father to his only biological son Channing Mitchell, who was age two at the time of Mr. Mitchell's death.

31. Mr. Mitchell was a role model within his community, and was employed by the Boys and Girls Club.

32. At the time of the events complied of, Dorian Gilmer was a 16 year old citizen and resident of Bradenton Florida. He was raised in Bradenton, graduated from Southeast High School, and is currently attending college at Bethune-Cookman University.

33. Mr. Gilmer major is Business Administration. Mr. Gilmer decided to further his education because this was his promise he made to his mentor Rodney Mitchell before his death.

34. On June 11, 2012, at approximately 9:30 p.m. in Sarasota, Florida, Defendant Deputy Adam Shaw (hereinafter Defendant Shaw) pulled the Decedent over in a predominately African American community area.

35. Defendant Shaw reported that the Driver (Decedent) was not wearing his seatbelt.

36. Decedent was driving a small white Jeep SUV 2005.

37. Decedent was accompanied by a minor passenger Dorian Gilmer.

38. Defendant Adam Shaw of the Sarasota Sheriff's Office was on patrol in a marked patrol vehicle.

39. Defendant Shaw was in the southbound turn lane on N. Washington Blvd. North Dr. Martin Luther King Jr. Way when he observed at night a 2005 white Jeep Liberty traveling northbound in the inner most lane of N. Washington Blvd. with the driver (Decedent) reported by Defendant Shaw for not wearing his seatbelt.

40. According Defendant Shaw's sworn statement to Sarasota Sheriff's Office investigators that his intent was to meet Defendant Tutko but, Defendant Shaw needed to turn his cruiser around on US 301 and head north.

41. Just before 9:30 P.M. Defendant Shaw (heading south) took a slight left turn, into a median where there is a U-turn lane. US 301 is a multi-lane highway with a posted speed limit of 45 MPH.

42. Defendant Shaw was stopped in the first U-turn lane waiting for a safe entry onto US 301 to proceed northbound.

43. Defendant Shaw's cruiser emergency lights or siren were not activated at this time.

44. Defendant Shaw reported that he observed Decedent's vehicle heading north with bluish halogen (aftermarket) headlights. Officer Shaw claimed to be able to see Decedent who was driving toward him with his headlights on.

45. As Decedent passed Defendant Shaw travelling approximately 45 mph with his headlights illuminated at night with the window tinted and rolled up, Defendant Shaw made a U-turn to get behind Decedent.

46. Defendant Shaw, on an off radio channel (which is not recorded) communicated to Defendant Sergeant Troy Sasse that he was going to stop the vehicle.

47. According to Defendant Shaw's sworn statement transcript on June 12, 2012, which was taken just a few hours after Mr. Mitchell's death. Defendant Shaw, was asked to:

   1) Describe the Decedent in detail;

   2) Describe the passenger in detail;

   However, Defendant Shaw was unable to accurately describe the Decedent to Sarasota Sheriff's Office investigators.

48. Defendant Shaw stated that the Decedent was wearing a white T-Shirt.

49. However, Decedent was shirtless.

50. Mr. Mitchell was stopped at the turn lane waiting for traffic to clear before he made a U-turn onto southbound N. Washington Blvd. South Dr. Martin Luther King Jr. Way.

51. At this point Defendant Shaw was directly behind Mr. Mitchell's vehicle.

52. After Mr. Mitchell made a U-turn onto southbound N. Washington Blvd. he proceeded down on South Dr. Martin Luther King Jr. Way, then made a right turn onto 1900 29th Street.

53. When Mr. Mitchell approached 1900 29th Street Defendant Shaw initiated his siren.

54. According to Mr. Gilmer, he said to Decedent, "oh, he just got behind us."

55. According to Mr. Gilmer, Decedent told him that he was not worried about that because he was wearing his seatbelt.

56. According to Defendant Shaw, he was concern because of the movement inside the Jeep, while he followed it and prior to activating his overhead lights to initiate the stop.

57. However, according to Defendant Shaw's traffic stop callout, "2950 US 301," he does not sound like he was under any stress; he does not give the dispatcher a license plate number, vehicle description, a reason for the traffic stop, or does he notify dispatcher that he needs assistance because he observed furtive movements, which elevated his concerns for officer safety.

58. Defendant Shaw never conducted a registration, plate, make, model of the car, and wanted check, via his mobile data terminal, prior to conducting the actual stop, or alerted the dispatcher of his concerns.

59. Defendant Shaw did not call in the car stop on a radio frequency that was monitored and recorded, but chose to operate on a "ghost radio frequency" instead, regardless of his concerns of movement inside the Jeep.

60. Mr. Mitchell made a left turn onto Washington Court and made a complete stop at 2805 Washington Court, which is located in front of a white abandoned house at the time of the incident.

61. Decedent drove up until he could locate a safe location to stop, passed the stop sign on the left at the corner of 1900 29th Street and Washington Court, drove down to a safe location, and then stopped his car at 2905 Washington Court.

62. After Defendant Shaw initiated a traffic stop on Mr. Mitchell he positioned his police vehicle immediately at the rear of Mr. Mitchell's car.

63. Defendant Shaw did not activate his lights until after Mr. Mitchell existed off the intersection, and entered on 1900 29th Street, which is a side street.

64. After Defendant Shaw initiated a traffic stop on Decedent he positioned his police vehicle immediately at the rear of Decedent's car, and exited his patrol car.

65. Meanwhile, Defendant Sergeant Sasse of the Sarasota Sheriff's Office was stopped at the red light at N. Washington Blvd. and Dr. Martin Luther King Jr. Way facing south in the turn lane to travel East.

66. Defendant Sasse stated that he heard Defendant Shaw over the police radio conduct a traffic stop of Mr. Mitchell on an off-channel, which is not recorded.

67. According to Defendant Sasse he did not have any idea why Defendant Shaw was pulling over Mr. Mitchell.

68. In fact, Defendant Sasse learned after killing Mr. Mitchell the reason why Defendant Shaw pulled over Mr. Mitchell after speaking with Defendant Shaw.

69. Defendant Sasse made an illegal turn down a one-way street, (which is clearly marked with a traffic sign posted at the intersection of Martin Luther King, Jr. Way and Washington Court, stating "Do Not Enter") with is his siren off onto Washington Court.

70. When Defendant Sasse arrived on the scene he positioned his patrol car (Tahoe SUV) in front of Decedent's car, boxing Decedent and Mr. Gilmer in.

71. According to Defendant Shaw, Defendant Sasse parked his Tahoe approximately one car length (10 feet away) in front of Decedent's Jeep, facing Decedent's car on a one-way street for an alleged seatbelt violation routine traffic stop.

72. Meanwhile, before Defendant Shaw exited his vehicle he radio into the dispatcher.

73. The radio transmission by Defendant Shaw calling out the traffic stop on the main Sarasota Sheriff's Office channel A1 seconds before shots were fired, at 14:04 audio recording, "2032 to 2347, 2950 US 301" (3505, Defendant Shaw's Employee ID number). "I am exiting my car at 2950 US 301."

74. The actual address of the traffic stop of Mr. Mitchell is 2805 Washington Court, and not 2950 US 301, which is the address Defendant Shaw called out on the main channel.

75. Meanwhile, Defendant Sasse radio in his traffic stop thirty-nine (39) seconds after Defendant Shaw radio in his traffic stop callout.

76. At 14:43, Defendant Sasse (Employee ID number 2605) stated to dispatcher, "out to assist Shaw on Washington Court."

77. Defendant Sasse never conducted a proper policy registration and wanted check, via his mobile data terminal, prior or after conducting the actual stop.

78. Meanwhile, Defendant Shaw approached Mr. Mitchell's car and stood at the driver's door.

79. According to Mr. Gilmer, Defendant Shaw approached Decedent's car and came to the driver's window, in a very aggressive manner.

80. When Defendant Shaw approached Decedent's car he stated to investigator LeFebvre that Decedent's was belted in at the traffic stop.

81. According to Mr. Gilmer, Defendant Shaw screamed out in a very aggressive tone, "put your god damn hands on the steering wheel boy!"

82. Defendant Shaw's commands were unnecessarily hostile and confusing.

83. According to Mr. Gilmer, Mr. Mitchell asked Defendant Shaw why he was pulled over.

84. Defendant Shaw never informed the Decedent why he was pulled over.

85. Meanwhile, according to Defendant Sasse, he stepped away from his cruiser, turned off his activate front cruiser lights, and Defendant Sasse reported that he turned on his spotlight, and aimed his cruiser spotlight at Mitchell's vehicle.

86. Defendant Sasse exited his patrol car from the front of Mr. Mitchell's car, and walked and stood near the left side of Mr. Mitchell's car.

87. Defendant Shaw saw Defendant hands the entire time he was located near the driver's window.

88. There was no reason to believe Decedent or Mr. Gilmer were armed.

89. According to Defendant Sasse he saw that Decedent had both hands on the steering wheel.

90. Defendant Sasse's body was never position directly in front of Decedent's car.

91. After Defendant Sasse stood in front of Defendant Shaw, Defendant Shaw commanded that Mr. Mitchell put his car in the park position.

92. Mr. Mitchell removed his right hand from the steering wheel to comply with Defendant Shaw's request to put the gear in the park position, while simultaneously Defendant Sasse backed up and disengaged his Sig Sauer P226 9mm firearm, and pointed his gun at Mr. Mitchell and fired the first shot.

93. According to Defendant Sasse sworn statement, the Decedent "then reached down with his right hand out of my view, and I didn't know whether or not he was unarmed."

94. Defendant Sasse claimed that he shouted a verbal command for the driver to "show his hands," as he drew his gun.

95. However, according to Mr. Gilmer and Defendant Shaw's sworn statements, they never heard Defendant Sasse give this command/warning.

96. In fact, Defendant Shaw stated when asked by investigator Sergeant Pingel, "Did you hear Sergeant Sasse saying anything?" Defendant Shaw replied, "I just I just heard. All I remember is hearing a shot go off and I remember firing my firearm."

97. Defendant Shaw, Decedent, or Mr. Gilmer never heard Defendant Sasse ordered Decedent to show his hands.

98. When Defendant Sasse backed up to draw his gun and point it at Decedent, Defendant Sasse's body still was never positioned in directly in front on Decedent's car.

99. In fact, Sasse had already decided to kill Mitchell when he backed up and drew his gun, trying to get a clear shot into Mitchell's head without shooting Defendant Shaw.

100. Defendant Sasse within seconds from exiting his vehicle has his weapon out and the muzzle is aimed at the Decedent.

101.   According to Sasse, he drew his gun because he could not see Decedent's right hand.

102.   However, unbeknownst to Defendant Shaw or Mr. Gilmer, Defendant Sasse had drew his gun and pointed it at Decedent while Defendant Shaw was in the line of fire.

103.   According to Defendant Sasse he drew his gun and pointed it at Decedent because Decedent took his right hand down from the steering wheel, even though Decedent took his right hand from the steering wheel to comply with Defendant Shaw's order to put the car in park.

104.   Defendant Sasse escalated to pointing his muzzle at Decedent and discharging it at Defendant Shaw, Decedent, and Dorian.

105.   In fact, when asked by investigator Mark LeFebvre, "when do you draw your weapon out?" Decedent Sasse stated, "as soon as he put his hands, my gun was coming out."

106.   According to Defendant Sasse, he perceived a threat because Mr. Mitchell removed his right hand from the steering wheel.

107.   However, Defendant Shaw was positioned where he could see Mr. Mitchell's hands, and Defendant Shaw did not perceived a threat because Mr. Mitchell removed his right hand from the steering wheel in compliance with Defendant Shaw's order.

108.     Meanwhile, Decedent saw Defendant Sasse pointing his gun at him and heard the first shot fired by Defendant Sasse.

109.     Simultaneously, Defendant Shaw (unknown to him that Defendant Sasse had drew his gun and pointed it at Decedent and him) reached in Decedent's car with his left arm being half way into the car, in order to place Decedent's car back into park.

110.     According to one eye witness, Jesus Torres, he stated that he heard a shot fired first, and then he saw the Decedent's car move.

111.     Decedent heard the first shot fired, turned the wheel towards the passenger Mr. Gilmer (away from the officers), before he was shot in the head.

112.     Decedent immediately became fearful of his and Mr. Gilmer's life, and he immediately perceived a threat after he saw a gun pointed at him and gun shot fired.

113.     According to Defendant Shaw, when he ordered Decedent to put the car back into park while he motioned his left arm half way into the car, Decedent yelled "NO!!!!!"

114.     However, with Defendant Sasse's gun already drawn, without warning and notice to Decedent, Mr. Gilmer, and Defendant Shaw, Defendant Sasse fired the first shot from his Sig Sauer P226 9mm handgun, struck the A frame (metal support that frames the front windshield) on the driver's side.

115.      Decedent did not yelled "NO!!!!" as to not comply with Defendant Shaw's order.   In fact, Decedent screamed "NO!!!!!" as an indicator for Defendant Sasse to not shoot him.

116.      Even before and after the first shot fired, Defendant Sasse was still never positioned in front of Decedent's car.

117.      Decedent perceived a threat and raised his left hand in a self-protective posture, he turned the steering wheel to the right in the opposite direction (to the right towards the curb) away from Defendant Sasse and Shaw to save both his life and Mr. Gilmer.

118.      Decedent was shot in the left hand (Palmer side of the left hand wound laceration by bullet), which continued to travel striking and entering his left side temple. This was the fatal shot, which resulted in Decedent's imminent death.

119.      Mr. Gilmer was in shocked that the officers started shooting, so he jumped down off the passenger seat down to the floor curled up in a ball like fashion, while his hands were positioned over his head.

120.      However, Defendant Sasse's fired his second shot from his Sig Sauer P226 9mm handgun, which struck Decedent's left hand (as it was up in a defensive posture), causing a deep gouging graze gunshot wound to Decedent's left hand, and travelled into Decedent's lower left temporal scalp, thus causing the death of Decedent.

121.     According to Defendant Shaw, he drew his gun after he heard a gunshot fired.

122.      Meanwhile, Defendant Shaw's fired first shot from his Sig Sauer P226 9mm, which struck Decedent's left eyebrow, gashed his left eyebrow, and continued into the a/c vent of the dashboard area.

123.      The second shot fired by Defendant Shaw struck Decedent's side rear cargo window and travelled down to the front and disintegrated.

124.     Defendant Shaw's second shot ricochet and hit Defendant Sasse in the face.

125.     Even after the shooting, Defendant Sasse did not radio to the dispatcher and reported the shooting, or call Emergency Medical Technician (EMT).

126.     Mr. Gilmer felt the car continued to move, and came up from the floor to figure out what was going on.

127.     Mr. Gilmer noticed the car was moving at a fast pace, and then the car started to turn as it continued moving at a fast speed.

128.     Mr. Gilmer noticed that the car was moving into the direction towards the major highway U.S. 301.

129.     Mr. Gilmer looked towards Mr. Mitchell, noticed that Mr. Mitchell's head was tinted back with his eyes opened wide, and Mr. Mitchell's hand were off the steering wheel.

130.     Mr. Gilmer shook Mr. Mitchell, and said, "bruh, we going across the highway, you better get right."

131.     However, Mr. Mitchell did not respond.

132.     Decedent's car hit over a curb, went across the highway, and hit multiple cars, and then crashed into the Sunoco gas station structure.

133.     After the car crashed into the second car Mr. Gilmer jumped out of the car as it was still moving. The minor child Mr. Gilmer escaped from the car, while screaming with blood all over his body and face, and ran bare feet for his life.

134.     Decedent's car came to a final stop when it crashed into a barrier in front of the structured gas station (Sunoco Gas Station).

135.     The radio transmission by Defendant Shaw calling out on the main Sarasota Sheriff's Office channel A1, after seventy-two (72) seconds (at 15:15, Defendant Shaw reported to dispatcher, "Shots Fired, Shot Fired....") from the time Defendant Sasse's exited his patrol car, both Defendants Sasse and Shaw had already discharged their weapons four times and fatally killing Mr. Mitchell.

136.     Defendant Shaw radio transmission to the Sarasota Sheriff's Office dispatcher 72 seconds after Defendant Sasse exited his car of the following:

   a.  Shooting at crime scene-Washington Court;

   b.  There is a multi-car accident scene-Sunoco;

   c.  Personal injury (PI);

    d.  A possible fatal shooting victim;

    e.  Gives a direction of travel for the passenger of Mr. Mitchell's car;

    f.  And that all requires EMS services immediately.

137.    At 15:50, (Signal 4 Sunoco), Defendant Shaw is out with Decedent and the Jeep at the Sunoco.  Defendant Shaw opens the driver's side door, reaches into the Jeep and shuts the motor off.

138.    At 15:24, Captain Dan Tutko (Sarasota Sheriff's Office) radio, "Talk to us Troy!"

139.    However, Defendant Sasse did not respond to Captain Tutko's command.

140.    Approximately  forty one (41) seconds later  Sarasota Sheriff's Office Unit requested Defendant Sasse to speak on the air as the supervisor to inform them what was going on, what he needs at Washington Court (shooting scene) and the Sunoco (accident scene) crime scenes.

141.    According to Captain Tutko's report he arrived in the area of Washington Court shortly after 15:15 callout of, "Shots Fired…" and observed Defendants Shaw and Sasse at the Sunoco with their cruisers.

142.    At 15:29, Defendant Sasse radio, "I didn't see where he went."

143.    Defendant Sasse ignored Captain Tutko's commands/orders.

144.    Mr. Gilmer was in a traumatic shock.

145.    Mr. Gilmer was so afraid that he ran to a relative's house.

146.    When Mr. Gilmer was picked up by his mother Jaime Harington from his auntie's house, she took him to Bradenton Police Station and he told them that two cop tried to kill him and the Decedent.

147.    While at the murder scene, the Crime Scene Officers arrived and opened the driver's door, unbuckled Decedent's seat beat, and pulled his dead body from the car.

148.    According to the Medical Examiner report transmitted by Dr. Wilson Broussard Jr., reflected that Mr. Mitchell's left hand is off the steering wheel with Mr. Mitchell's left palm facing Defendant Sasse and Shaw, which is sign of a universal accepted posture of compliance.

149.    However, Defendant Sasse ignored this and still fired shots at Mr. Mitchell.

150.    It is undisputed that Mr. Mitchell's tires were turned to the right away from Defendants Sasse and Shaw.

151. However, Defendant Sasse stated to investigator Mark LeFebvre that, "I thought that if, if he even turned slightly, that it would have definitely pulled me under. I thought I was gonna get actually run over at that point. I thought, uh, I thought I was, could've been done."

152. When asked by investigator Mark Lefebvre, "did you ever fire when Decedent's was driving past you?" Defendant Sasse stated, "is it possible,

because it, it could be, but it seemed like my rounds went through the windshield."

153. In fact, there were no trajectory found on the windshield of Decedent's car, which is clear evidence that Defendant Sasse's was not positioned in the front of Decedent's car prior to gunshot being fired.

154. When asked by investigator Mark LeFebvre," if he shot from forward/front of the vehicle, and whether he was aiming for the driver?" Defendant Sasse, answered, "Right."

155. Witness Dorian Gilmer cooperated with police and during a recorded interview with Sarasota Sheriff's Office investigators regarding the June 11, 2012, shooting. Mr. Gilmer explained that Defendant Shaw signaled for Decedent Mitchell to stop and that Mr. Mitchell did stop.

156. Mr. Gilmer stated to Sarasota Sheriff's Office investigators that Defendant Shaw presented himself as very "aggressive." However, investigators never explore further what Mr. Gilmer meant by "aggressive."

157. This is very important because Defendant Shaw received a 90 day administrative review for being "aggressive" towards other motorists before the Rodney Mitchell's "alleged seatbelt" traffic stop.

158. Defendant Shaw has been previously disciplined administratively after several motorists complained to Sarasota Sheriff's Office that Defendant

Shaw racially profiled black citizens, stopping these citizens for alleged "seatbelt" violations, and issued tickets to them under the color of law.

159. Mr. Gilmer stated to Sarasota Sheriff Office investigators that Defendant Shaw is out of his cruiser as Defendant Sasse arrives and orders Mr. Mitchell to put the Jeep into "Park," and that Mitchell followed those lawful commands.

160. Mr. Gilmer reported that Defendant Sasse arrived soon after Defendant Shaw exited his cruiser and approached Mr. Mitchell's driver's side window.

161. According to Mr. Gilmer, Defendant Sasse parked his cruiser towards Mr. Mitchell's front, and Defendant Shaw parked his cruiser towards Mr. Mitchell's rear.

162. With Defendant Sasse and Defendant Shaw now both on scene and out of their respective cruisers Defendant Shaw is the primary officer that has a full view inside Mr. Mitchell's car and Defendant Sasse is the assist officer who can only see the steering wheel, the dashboard, and the occupants approximately shoulder height up.

163. Defendant Shaw never alerts Defendant Sasse to a "gun" nor did Defendant Shaw, who is the primary officer at the window ever have a perception that he needed to unholster his gun due to a threat of gun or any other weapon until after Defendant Sasse unholstered-point and began to shoot at Mr. Mitchell.

164.    Mr. Gilmer's witness statement establishes Mr. Mitchell's intent before being fatally shot by Defendant Sasse.

165.    Mr. Gilmer establishes that Mr. Mitchell's intent was not to harm policemen, his intent was actually to avoid being shot by Defendant Sasse.

166.    Mr. Mitchell removed his right hand from the steering wheel thereby complying with Defendant Shaw's lawful order and Defendant Sasse, the assistant officer, created confusion and made a gross error in judgment when he reported that he ordered Mr. Mitchell to, "Show me your hands."

167.    However, according the Defendant Shaw and Plaintiff Mr. Gilmer, they did not hear Defendant Sasse give Decedent any warning or order to "Show me your hands."

168.    According to Defendant Shaw's Level of Resistance Report, Defendant Shaw, as the primary officer at the window with Mr. Mitchell reported, "I began yelling at the driver to put the vehicle back into park."

169. However, according to Defendant Sasse's Level of Resistance Report, Defendant Sasse reports, "The suspect then reached down with his right hand out of my view. I then began to draw my firearm from the holster for Dep. Shaw's and I safety and yelled "show me your hands."

170. Defendant Sasse states in his second interview, "I felt like if I didn't fire he could, he could of easily just turned the vehicle at all." which is a deviation from his first statement regarding a "gun threat" to it now being a "car threat.

171.    Defendant Sasse tells Sarasota Sheriff's Office investigators, "when I saw him put his hand (right) down that's when I start to back up because I don't know if he's got a gun. I don't know what he's got."

172. Defendant Sasse makes an admission to Sarasota Sheriff's Office investigators within his second witness statement, that he had no clue if Mr. Mitchell possessed a gun.

173.    In one interview Defendant Sasse stated to Sarasota Sheriff's Office investigators, "I was raising up my firearm as I was backing up when he took off. However, when asked again why he pulled out his gun, the Defendant Sasse tells Sarasota Sheriff's Office investigators, "when I saw him put his hand (right) down that's when I start to back up because I don't know if he's got a gun. I don't know what he's got."

174. Investigator Sergeant Kevin Pingel remarks, "But he made a move with his right hand (from steering wheel) that concerned you that what's motivated. Defendant Sasse responded, "As soon as he moved that hand down."

175. The Rodney Mitchell Medical Examiner autopsy report created by Dr. Wilson Broussard Jr., reported that Mr. Mitchell's left hand on the palmar surface was up palm facing Defendants Sasse and Shaw prior to being shot by Defendant Sasse.

176. Within seconds, Decedent lay dead in the driver's seat as a result of one gunshot wound to the left temporal.

177. The bullets that killed Rodney Mitchell were fired from Defendant Sasse's Sig Sauer P226 handgun.

178. The Sarasota Sheriff's Office issued Defendant Shaw and Sasse the handguns that killed and wound Rodney Mitchell.

179. At the time of the shooting, Rodney Mitchell was unarmed and there were no weapons found on or around Rodney Mitchell's body.

180. At the time of the shooting, Dorian Gilmer was unarmed and there were no weapons found on or around Dorian Gilmer.

181. Rodney Mitchell did not provoke or threaten Shaw and/or Sasse, and did not engage in any form of violence or violent resistance towards Shaw and/or Sasse.

182. Dorian Gilmer did not provoke or threaten Shaw and/or Sasse, and did not engage in any form of violence or violent resistance towards Shaw and/or Sasse.

183. As a result of being shot by Shaw and Sasse's handguns, Rodney Mitchell suffered:

   (a) Deep gouging graze wound on the left hand;

   (b) Laceration above left eyebrow;

   (c) Soft tissue trauma ;

   (d) Small punctate abrasions; and

   (e) Death

184. Dorian Gilmer suffered numerous wounds to his face, neck, and shoulders from flying glass, possibly bullet fragments, and Post Traumatic Stress-Disorder.

185. Defendants did not suffer any injuries.

186. Rodney Mitchell was African descent.

187. Dorian Gilmer is African descent.

188. At all times material hereto, Defendants Troy Sasse and Adam Shaw acted as an agent and employee of the Sheriff of Sarasota County, Florida, and all of Defendant Shaw and Sasse's actions were carried out in the course and scope of said agency and employment.

189. Defendant Hon. Knight was aware of facts that gave rise to an inference that Defendant Sasse and Shaw were unfit for their employment.

190. Defendant Hon. Knight was on notice that Defendant Sasse and Shaw had engaged in bizarre, dangerous, and deceptive actions while in their employments.

191. Defendant Hon. Knight failed to appropriately screen, control, train, and discipline Defendants Shaw and/or Sasse.

192. After the actions complained of, Defendant Knight failed to appropriately investigate the death of Rodney Mitchell and failed to discipline or terminate Defendant Shaw and/or Sasse.

193. At the time Defendants Sasse and Shaw shot Rodney Mitchell to death and while placing Dorian Gilmer's life in peril, they had been a Sarasota Sheriff's Office officers a little over 11 and four (4) years respectively.

194. Prior to coming to the killing of Mr. Rodney Mitchell, Defendant Sasse had worked five (5) years as a Deputy Sheriff in Sarasota County, when he and other Sarasota Sheriff's Office officers discharged their firearm shooting 58 rounds at a man, which resulted in his death.

195. Defendant Sasse in 2011 pulled his gun at another person where it was not warranted.

196.     Both Defendant Sasse and Shaw have a lot of citizen complaints regarding using excessive force and illegal stop and searches.

197.     Although both Sasse and Shaw were out of compliance with their firearms training at the time, they were not disciplined in the incident.

198.     Although Defendant Sasse was out of compliance with his traffic stop training at the time, he was not disciplined in the incident.

199.     Defendant Shaw and Defendant Sasse violated a law enforcement standard when they operated on an off radio channel, which is not recorded.

200.     Defendant Shaw and Defendant Sasse violated a law enforcement standard when they failed to report the traffic stop via mobile data terminal prior to conducting the actual traffic stop.

201.     Defendant Sasse violated a law enforcement standard when he positioned his marked patrol Tahoe in front of the alleged violator's car in assisting with the traffic stop procedure.

202.     Defendant Sasse violated a law enforcement standard when he drew his gun and placed his finger on the trigger unwarranted.

203.     According to Sarasota Sheriff's Office procedures, the patrol vehicle should be positioned approximately one car length behind the violator's vehicle, this position provides maximum safety to the violator, other traffic and most importantly, to the deputy.

204.     Both Defendants Sasse and Shaw violated a law enforcement standard when they failed to notify the dispatcher of the intended location of the traffic stop, tag number, and occupants' descriptions.

205.     Defendant Sasse violated a law enforcement standard when he drew weapon on an unarmed suspect that was complying with an officer's commands.

206.     According to Sarasota Sheriff's Office procedures, members may only draw or display a firearm for legal use or official inspection.

207.     According to Sarasota Sheriff's Office procedures, deputies are prohibited from having his fingers on the trigger until on target and ready to engage.

208.     According to Sarasota Sheriff's Office procedures, places a greater value on the preservation of life than on protection of property, the deadly force policy is not a shoot-to-wound policy nor is it a shoot-to-kill policy; it is a shoot, to stop the threat.

209.     According to Sarasota Sheriff's Office procedures, deadly force shall not be used for traffic violators.

210.     According to Sarasota Sheriff's Office procedures, it is policy to provide and maintain procedures to follow when a sworn member is confronted with situations where force is necessary to execute his/her legal authority; attempts will be made to achieve control though advice, warnings, and persuasion; sworn members shall use only such force that is necessary to affect an arrest or apprehend or physically control an opposing person; the only thing that justifies a law enforcement office to use deadly force against another human being is the overwhelming need to cause that person to immediately cease what he is doing; the need must be so great that it does not matter if the person dies as a result of being stopped.

211.     According to Sarasota Sheriff's Office procedures, the use of lethal impact munitions should only occur after all other options to control or apprehend suspect have been considered; use of impact munitions would be used to neutralize a significant immediate threat that could otherwise result in deadly force.

212.    According to Sarasota Sheriff's Office procedures, the target areas for less than lethal munitions are the same as impact weapons and specifically exclude the head, neck and spine for "Pepper-ball" and the head, neck, spine, and groin for other less lethal impact munitions.

213.    According to Sarasota Sheriff's Office procedures, shooting at or from a moving vehicle may have serious consequences and deputies utilizing firearms in these situations will abide by Sheriff's Office deadly force policy and must be aware of the limitations and consequences of firing weapons in moving vehicle situations.

214.    By drawing his weapon, Defendant Sasse initiated and escalated a series of events that led to an unlawful use of deadly force.

215.    The utilization of deadly force by Defendant Sasse and Defendant Shaw were unnecessary, unwarranted, and excessive.

216.    The law was clearly established prior to this incident, that deadly force upon a criminal suspect may not be used by a law enforcement officer unless:

    a.  it is necessary to prevent their escape and,

    b.  the officer has probable cause to believe the suspect poses a serious threat of death or serious physical injury to the officer or others.

217.    The use of a firearm by an officer constitutes the use of deadly force.

218.    Both Defendants Sasse and Shaw drew and discharged their firearm without justification.

219.    Defendant Sasse's drawing and discharge of his firearm was intentional, willful, with callous indifference to the consequences of his actions.

220.    Defendant Sasse's acts escalated the level of force unreasonably.

221.    From 2009 to current, Defendant Hon. Thomas Knight served as Sheriff of the Sarasota Sheriff's Office and chief policymaker for the Department.

222.    It was the custom of the Sarasota Sheriff's Office to take little or no disciplinary action in cases of constitutional abuses by its law enforcement officers.

223.    It was the custom of the Sarasota Sheriff's Office to take little or no disciplinary action in cases of excessive force by its law enforcement officers.

224.    It was the custom of the Sarasota Sheriff's Office to honor and reward unusually physically aggressive and intimidating police officers.

225.    It was the custom of the Sarasota Sheriff's Office to honor and reward "results-oriented" police work even when that work violated constitutional rights.

226.    In fact, on June 11, 2012, after Rodney Mitchell was shot and killed, and despite a history of committing Sarasota Sheriff's Office safety violations, internal complaints by fellow officers, numerous citizen complaints, Fourth Amendment complaints, false report complaints, and other serious violations the Sarasota Sheriff's Office reassigned Defendant Shaw to the TAC unit under

Defendant Sasse, Captain Dan Tutko, and Lieutenant John Jernigan immediately (that same day) following Mr. Mitchell's homicide.

227.    "Results-oriented" police work means police work that results in arrests and prosecutions, even when prosecutions fail because of abusive practices.

228.    Defendant Hon. Thomas Knight failed to establish proper and adequate supervisory policies regarding the conduct of his officers, and failed to properly screen, evaluate, discipline, retrain, or appropriately terminate, his officers.

229.    Defendant Hon. Knight failed to properly train, or ensure the training of, the officers under his command in the reasonable use of force, including deadly force.

230.    Defendant Hon. Knight encouraged, condoned, acquiesced in, tolerated, ratified, or failed to remedy, the wrongful acts of his subordinates.

231.    Defendant Hon. Knight annually approved each of thousands of uses of force as "justified" each year and disapproved fewer than one per year on average.

232.    Sarasota Sheriff's Office knew that uses of force, including deadly force, would rarely be reviewed critically.

233.    Sarasota Sheriff's Office violated the constitutional rights of persons on a regular basis without fear of discipline or termination.

234.    Sarasota Sheriff's Office used unreasonable force against citizens on a regular basis without fear of discipline or termination.

235.    Constitutional abuses, including unreasonable uses of force, by Sarasota police officers were widespread and long-standing.

236.    In his five years as Sheriff of the Sarasota Sheriff's Office, Defendant Hon. Knight rarely disciplined, never seriously disciplined, and never terminated a police officer for the use of excessive force.

237.    Defendant Sasse violated law enforcement standards by drawing his weapon inappropriately when he encountered no threat to his safety.

238.    Defendant Sasse violated law enforcement standards by drawing his weapon and keeping his finger on it while there was no threat existed.

239.    Defendants Sasse and Shaw violated law enforcement standards by failing to conduct a proper traffic stop.

240.    Defendant Sasse violated law enforcement standards by falsely describing the interaction between himself and the decedent, stating that they were both on their knees struggling over his weapon at the time of the shooting.

241.    Defendant Sasse violated law enforcement standards by falsely describing the interaction between himself and the decedent, stating that the decedent was "not complying with officer's orders."

242.    Defendant Sasse violated law enforcement standards by falsely describing the interaction between himself and the decedent, stating that he yelled "show me your hands."

243.   Defendant Sasse violated law enforcement standards by falsely describing that he turned his spotlight on and shined it into the vehicle that was stop.

244.   Defendant Sasse violated law enforcement standards by falsely describing the interaction between himself and the decedent, stating that he was located in the front of decedent and the decedent attempted to hit him with the car.

245.   Defendant Shaw violated law enforcement standards by falsely describing that decedent did not want to stop after he initiated his siren and emergency lights.

246.   Defendant Shaw violated law enforcement standards by falsely describing that the decedent did not comply with his orders.

247.   All Defendants Sasse and Shaw's false statements were readily discernable from their testimonies, the physical evidence, and were known to investigators.

248.   Defendant Hon. Knight subsequently inquired upon the death of Decedent Rodney Mitchell and was made aware of the foregoing facts but took no action to correct or discipline any employee.

249.   In fact, when Decedent's mother Natasha Clemons inquired about what happened to her son, Defendant Hon. Knight stated, "your son is not the only person we killed, we killed seven others!"

250.     Defendant Hon. Knight embraced his statement to Ms. Clemons with honor, and without remorse or conscious.

251.     Defendant Hon. Knight imposed no discipline and required no remedial training of Defendants Sasse or Shaw after the incident complained of.

252.     As a direct, proximate and foreseeable result of Shaw and Sasse's actions, Rodney Mitchell suffered traumatic injuries, pain, and death.

253.     As a direct, proximate and foreseeable result of Defendant Shaw and Sasse's actions, Mr. Mitchell's only son, Survivor Channing Mitchell has suffered mental anguish, pain and suffer, loss of ability to enjoy life and other losses.

254.     As a direct, proximate and foreseeable result of Shaw and Sasse's actions, Dorian Gilmer suffered traumatic injuries, pain, and suffering.

255.     As a direct and proximate result of the wrongful acts, Channing Mitchell, lost the support and services of the decedent, future loss of support and services, the replacement value of decedent's service, loss of decedent's companionship, due to decedent's injury and death.

256.     Channing Mitchell's injuries are permanent and continuing and Channing Mitchell will suffer such losses in the future.

257.     The decedent's estate has suffered medical and funeral expenses and loss of net accumulations due to the decedent's injury and death.

258.     Rodney Mitchell had a guaranteed right to be free from the use of excessive force.

259.     Pursuant to the expressed terms of the Fourth and Fourteenth Amendments of the United States Constitution, that right cannot be taken or infringed by any governmental officer or agency without due process of law.

260.     Plaintiffs have had retained the services of the undersigned attorneys and is obligated to pay reasonable attorneys' fees for such services in pursing the claims asserted herein.

261.     Plaintiff Natasha Clemons, as personal representative of the Estate, seeks an award of compensatory and punitive damages, costs, and expenses, and reasonable attorneys' fees more specifically described below.

262.     Plaintiff, Dorian Gilmer seeks an award of compensatory and punitive damages, costs, and expenses, and reasonable attorneys' fees more specifically described below.

## Causes of Action

## Count I: Violation of Rodney Mitchell Fourth Amendment Rights under 42 U.S.C. § 1983 (as to Defendants Sasse and Shaw) Police Officer Liability

263.     Plaintiff re-alleges the Common Allegations of Fact above.

264.     Rodney Mitchell was forced to endure great conscious pain and suffering before his death.  Rodney Mitchell filed no action during his lifetime, but under the laws of Florida this action survives and may be asserted by his Estate under the Survival Statute F.S. 46.021.

265.     Plaintiff's claims damages for the wrongful death of his father, Rodney
Mitchell, and for the loss of his income, services, protection, care, assistance,
society, companionship, comfort, guidance, counsel and advice, and for funeral
and burial expenses under 42 U.S.C. 1983, and the Florida Wrongful Death Act
F.S. 768.16 et al.

266.     Plaintiffs bring a claim against Defendants Shaw and Sasse, individually
as well as in their official capacity, pursuant to 42 U.S.C. § 1983 and for punitive
damages.

267.     At all material times, Defendants Shaw and Sasse were acting under
color of state law as an agent and employee of Defendant, Hon. Thomas
Knight, Defendants were wearing their official Sarasota Sheriff's Office
uniform, and were acting in the course and scope of their duties as a Sarasota
Sheriff's Office Deputy and Sergeant, respectively at the time they shot and
killed Mr. Mitchell.

268.     Force is excessive, and therefore violates the Fourth Amendment, if it is
not reasonable in light of the circumstances facing the officer. See Graham v.
Connor, 490 U.S. 386, 398 (1989).

269.     The facts and circumstances of this case show that Defendants Shaw
and Sasse acts of shooting and killing Decedent was clearly unreasonable.

270.     At the time of the incident, Defendants Shaw or Sasse had no reason to
believe that Mitchell or Dorian were armed or dangerous.

271.    First, Mitchell made no violent movements towards Shaw, Sasse, or any other person that could be interpreted as threatening.

272.    Second, Mitchell made no verbal threats to Defendants Shaw, Sasse, or any other person.

273.    Third, Mitchell did not touch Defendants Shaw or Sasse.

274.    Fourth, it was clear to Shaw and Sasse that Decedent was unarmed and did not have any weapon or dangerous device readily at hand.

275.    Defendants Shaw or Sasse did not have a reasonable fear of imminent bodily harm when they shot and killed Mitchell nor did Defendants Shaw or Sasse have a reasonable belief that any other person was in danger of imminent bodily harm from Mitchell.

276.    Consequently, shooting and killing Mitchell was unwarranted under these circumstances, and was objectively unreasonable when comparing or balancing the amount of force used against the need for the force.

277.    Therefore, by using subjectively and objectively unreasonable deadly force while acting under color of state law, Defendants Shaw and Sasse violated Decedent' rights under the Fourth and Fourteenth Amendments to the United States Constitution and caused his wrongful death.

278.    The acts and omissions of Defendants Sasse and Shaw by boxing him in, deploying firearms, and applying unnecessary force after the initial traffic stop

of Mitchell when he was not accused of committing any crime or violating any traffic laws.

279.   Defendant Sasse unholstered and pointed his gun at Mitchell without reason to unholster his gun and point it at Mitchell, and when the defendants had no reasonable basis to believe that Mitchell posed any threat during the course of the seizure, constitutes the use of unreasonable and excessive force in violation of Plaintiff-Decedent's Fourth Amendment rights.

280.   As a direct and proximate result of the unreasonable use of force, Mitchell suffered great physical harm and conscious pain and suffering, tremendous emotional and psychological anxiety and ultimately his death.

WHEREFORE, plaintiffs pray that this Court enter judgment as noted below.

### Count II:  Violation of Rodney Mitchell Fourth Amendment Rights Under 42 U.S.C. § 1983 (as to Defendant Hon. Thomas Knight)

281.   Plaintiff re-alleges the Common Allegations of Fact above.

282.   At all times material hereto, Sarasota Sheriff's Office through its chief policy maker in law enforcement, Sheriff's Hon. Thomas Knight, had a duty to adopt and implement rules and procedures to ensure that his officers use reasonable suspicious and/or have probable cause prior to conducting a traffic stop, to communicate on a recorded channel, to use the mobile data terminals prior to conducting a traffic stop, to positioned his/her patrol vehicle in the rear of suspect, and to use the least amount resistance to cease an action of a suspect

when the officers have knowledge that the suspect is unarmed and is within reach of a suspect to cease action, and give truthful reporting, and to communicate with each officers that is out in the field together for the safety of the alleged suspect, bystander, and the officers.

283.    This duty includes, but is not limited to, the duty to create, adopt and implement rules, regulations, practices and procedures which clearly direct deputies as to the appropriate use for conducting a traffic stops, positioning his/her patrol car in the rear respective to suspect car, use alternatives method before employing the use of deadly force, when and when not to drew firearm, adopting definitive and authoritative command for the proper use of firearm, firearm discipline is essential to provide safety of officers, alleged suspects, and bystanders, training on officers being familiar with each other and the neighborhood, how to avoid crossfire hazard, communicate with each officer to obtain a clear understanding prior to the use of deadly force, devise training procedures that would reduce the possibility of accidental shootings misunderstanding situation, adopting anti-racial profiling procedures, when encountering a law abiding citizens.

284.    Defendant Hon. Thomas Knight's failure to adopt and implement adequate polices, training, discipline, and supervision regarding his officers' conducting illegal traffic stops, including but not limited to, the use of confrontational verbal aggression, immediate show of physical force, Taser,

firearm, the dangers of drawing a weapon on an unarmed citizen, anti-racial profiling, the danger of not communicating with fellow officers in the field together, the danger of shooting at a moving car, the danger of drawing a gun based on a misconception and misunderstanding, the danger of not being alert and paying attention to officer's surrounding area, and the consequences of shooting at an unarmed person that knows that a gun is being pointed at him, has his left hand up and his body tilting in the opposite direction of the officer that has a gun pointed at him in a defensive posture while yelling "NO!!!!!", which resulted in the blatant use of excessive force by the police officers against Mr. Mitchell and Mr. Gilmer as described herein.

285.    At all times material hereto, the defendant Hon. Thomas Knight knew or was deliberately indifferent that persons being seized by his officers might be fully restrained without legal justification, warning, and while complying with lawful commands relating to the traffic stop procedures.

286.    At all times material hereto, the defendant Hon. Thomas Knight knew and/or was deliberately indifferent that a policy for the use of force was necessary in order to avoid repeated use of excessive force by his deputies in such circumstances.

287.    At all times material hereto, the defendant Hon. Thomas Knight knew and/or was deliberately indifferent that a policy for traffic stop was necessary in

order to avoid repeated use of excessive force by his deputies in such circumstances.

288.     At all times material hereto, the defendant Hon. Thomas Knight knew and/or deliberately indifferent that a policy for radio/laptop procedures was necessary in order to avoid repeated use illegal traffic stop and false reporting by his deputies in such circumstances.

289.     At all times material hereto, the defendant Hon. Thomas Knight knew and/or deliberately indifferent that a policy for positioning of officers patrol vehicles respective to the allege suspect car procedures was necessary in order to avoid repeated use of violation of a person's right to be free from restraint or false imprisonment without legal justification by his deputies in such circumstances.

290.     At all times material hereto, the defendant Hon. Knight knew and/or deliberately indifferent that a policy for firing a moving vehicle procedures was necessary in order to avoid repeated use of placing bystanders, officers, and the allege suspect lives at peril by his deputies in such circumstances.

291.     At all times material, and in light of the defendant Hon. Thomas Knight's customary and regular use of force when seizing a person while conducting a traffic stop as one of the many methods of force regularly used by his officers, the defendant Hon. Knight was aware that the failure to establish a custom, policy and practice relating to the use of force, firearm, or Taser against

a citizen that showed no resistance to officer orders resulted in repeated instances of excessive force resulting in serious injury and death.

292.     At all times material, and in light of the defendant Hon. Knight's customary and regular practice of conducting illegal and unwarranted traffic stops of citizens as one of the many methods of practice regularly used by his officers, the defendant Hon. Thomas Knight was aware that the failure to establish a custom,   policy and practice relating to conducting legal and warranted traffic stops against traffic violators resulted in repeated instances of racial profiling, violation of citizens constitutional rights, and excessive force resulting in serious injury and death.

293.     At all times material, defendant Hon. Thomas Knight was deliberately indifferent to the known probability that instances of excessive force due and use of boxing method to seize a non-traffic violator who was in a defensive posture before shooting would occur, such as in the case of Mr. Mitchell, by failing or refusing to establish a use of force policy, traffic stop procedures, radio and recording monitoring, training or supervision inclusive of excessive force, deployment of firearm weapons, legal traffic stops and monitoring, officers effective understanding and attention to surrounding area, adequate and truthful reporting, and full body restraint.

294.     The actions of defendant Hon. Thomas Knight constituted deliberate indifference toward the violation of Plaintiff's right to be free of excessive force.

295. Defendant Hon. Thomas Knight also had supervisory liability for the violation of Plaintiff's Fourth Amendment rights under the United States Constitution.

296. As a direct, proximate and foreseeable result of defendant Hon. Thomas Knight's polices, customs and practices, Mr. Mitchell and Mr. Gilmer suffered a violation of their Fourth Amendment right to be free from unreasonable seizures. Mr. Mitchell suffered conscious pain and suffering during his life time and his family have suffered a great loss as a result of Mr. Mitchell's death. They also have had to bear the costs of the funeral and burial expense. Mr. Gilmer continue to suffer from conscious pain and suffering and Post-Traumatic Stress Disorder.

297. Defendant Hon. Thomas Knight acted with indifference in causing the aforesaid constitutional violation by Defendants officers Sasse and Shaw to occur, as follows:

      (a) Defendant Hon. Thomas Knight failed to adequately train and educate his officers, including Officers Sasse and Shaw in the use of force and the use of firearm as a means of force, thereby creating an atmosphere of illegal and unconstitutional behavior with respect to the use of force, in deliberate indifference and reckless disregard to the health and welfare of persons seized by the officers;

(b) Defendant Hon. Thomas Knight failed to train and educate his officers, including defendants Sasse and Shaw with respect to the use of force applications which he knew that his officers were using and which posed a serious risk of personal injury including, but not limited to, the use of firearm against non-violent, non-traffic violator who was non-resistance to officer command as a means to compel compliance and allowing full restraint regardless of a defensive palmar posture being displayed;

(c) Defendant Hon. Thomas Knight failed to adequately monitor and evaluate the performance of his officers including defendants Sasse and Shaw including their use of force applications, in deliberate indifference and reckless disregard to conducting valid traffic stops of persons, including Mr. Mitchell and Mr. Gilmer;

(d) Defendant Hon. Thomas Knight failed to adequately train, monitor, and evaluate the performance of his officers including their use of investigation of crime and falsifying reports, in deliberate indifference and reckless disregard to investigating other colleagues/fellow officers in grievances complaints, including Mr. Mitchell and Mr. Gilmer;

(e) Defendant Hon. Thomas Knight failed to adequately monitor and evaluate the appropriateness of his Officers' use of firearms as a

means of deadly force, in deliberate indifference and reckless disregard to conducting valid and legal traffic stops of persons being seized, including Mr. Mitchell and Mr. Gilmer;

(f) Defendant Hon. Thomas Knight had and has a policy, custom and practice of allowing his Officers, including but not limited to Defendants Sasse and Shaw to conduct illegal traffic stop, illegal searches and seizures, draw weapons at non-violent persons, to use deadly, excessive, and/or unreasonable force without fear of discipline, thereby creating an atmosphere where such behavior is accepted, approved and ratified, in reckless disregard and deliberate indifference to the health and welfare of persons being pulled over for illegal traffic stops, including Mr. Mitchell and Mr. Gilmer;

(g) Defendant Hon. Thomas Knight ratified and approved of the use of excessive force by illegal seizure, firearms, including the use of force against Mr. Mitchell and Mr. Gilmer as aforementioned, adopting these uses of excessive forces as acceptable policy and practice.

298.    The aforementioned actions committed by defendants Sasse and Shaw were proximately caused by the de facto policies, customs, and practices of Defendant Hon. Thomas Knight, the failure to establish proper polices, customs and practices, the delegation of policy-making authority to his Officers, his failure to train on the use of legal/valid traffic stops, how to avoid violating

persons constitutional rights, the use of firearms, the use of force, failure to train in the misunderstanding and miscommunication of officers, and his ratification of excessive force, as alleged in paragraphs herein.

299.    The aforementioned policies, customs, practices and omissions of Hon. Thomas Knight, alleged herein, were the underlying cause of Mr. Mitchell's death and Mr. Gilmer's injuries.

WHEREFORE, plaintiffs pray that this Court enter judgment as noted below.

## Count III: Deliberate Indifference under 42 U.S.C. § 1983: as to Defendant Hon. Thomas Knight

300.    Plaintiffs re-alleges the Common Allegations of Fact above.

301.    Plaintiff is entitled to relief against Defendant Knight because Defendant Knight violated the Fourth Amendment rights of Plaintiff's decedent.

302.    At all times material hereto, Defendant Knight had a duty to adopt and implement rules and procedures to ensure that his deputies used a reasonable amount and degree of force in the apprehension of suspects.

303.    Defendant Knight's duty includes, but is not limited to, the duty to create, adopt, and implement rules, regulations, practices, and procedures, which clearly direct sheriff's deputies as to the appropriate use of deadly force.

304.    Defendant Knight's deliberate indifference in adoption and implementation of policies regarding his deputies' use of force, including deadly force, resulted in the tragic, and unnecessary use of force by Defendant Knight's

employee, Troy Sasse and Adam Shaw, as described in the Common Allegations of Fact.

305. At all times material hereto, Defendant Knight knew, and it was foreseeable, that Defendant Shaw and Sasse might act in an unreasonable and excessively violent fashion in the course of their employment as a Deputy and Sergeant, respectively.

306. At all times material, and in light of the customary and regular use of firearms in citizen encounters, Knight was aware that the failure to establish a custom, policy and practice relating to the use of firearms would result in unnecessary serious injury including death.

307. At all times material, Knight was deliberately indifferent to the known probability of deadly force against unarmed persons by failing or refusing to establish a firm and enforced policy on use of force and firearms that forbid such use unless it was necessary and reasonable.

308. Knight, with deliberate indifference, delegated the final decision-making authority as to whether to use a firearm against a citizen to the individual police officer-in this instance, both Defendants Sasse and Shaw.

309. As such, Defendants Sasse and Shaw acted as the final policy maker for the Sheriff of Sarasota County when they chose to use deadly force against Mitchell.

310.    As a direct, proximate and foreseeable result of Defendant Knight's customs, policies and practices, Rodney Mitchell suffered fatal injuries.

311.    Defendant Knight further acted with deliberate indifference in causing the aforesaid constitutional violation by Defendants Sasse and Shaw to occur, as follows"

a) Defendant Knight's failure to adequately train his deputies, including Defendant Shaw and Sasse, in the use of force and the use of firearms, thereby creating an atmosphere of illegal and unconstitutional behavior with respect to the use of force, in deliberate indifference toward persons confronted by Knight's deputies, including Rodney Mitchell and Dorian Gilmer;

b) Defendant Knight failed to train his officers, including Defendants Shaw and Sasse, with respect to the use of force applications which he knew that his officers were using and which posed a serious risk of personal injury including, but not limited to, the unnecessary and unreasonable use of firearms against unarmed citizens;

c) Defendant Knight failed to adequately monitor and evaluate the performance of his deputies, including Defendants Shaw and Sasse, including their use of force applications, in deliberate indifference and reckless disregard to unarmed citizens including Rodney Mitchell and Dorian Gilmer;

d) Defendant Knight failed to monitor and evaluate the appropriateness of his deputies' use of firearms in deliberate indifference and reckless disregard to the safety of unarmed citizens, including Rodney Mitchell; and

e) Defendant Knight had a policy, custom and practice of allowing his deputies to use excessive and unreasonable force by allowing his police officers to misuse firearms, with deliberate indifference to life and safety of unarmed citizens, including Rodney Mitchell;

f) Defendant Knight had a policy, custom and practice of allowing his deputies to provoke and escalate conflict with unarmed persons, in reckless disregard and deliberate indifference to the life and safety of unarmed citizens, including Rodney Mitchell.

312.    The aforementioned actions committed by Defendants Shaw and Sasse were proximately caused by the de facto policies, customs and practices of Defendant Knight, the failure to establish proper policies, customs and practices, the delegation of policy-making authority to his deputies, his failure to train on the use of deadly force, and his ratification of excessive deadly force, as alleged above.

313.    All such acts and omissions of Defendant Knight were committed with or evidenced by deliberate indifference to the risk of serious injury or death.

314.    The aforementioned policies, customs, practices and omissions of Defendant Knight, alleged in the Common Allegations of Fact, were the underlying cause of Rodney Mitchell's suffering and death.

315.    The aforementioned policies, customs, practices and omissions of Defendant Knight, alleged in the Common Allegations of Fact, were the underlying cause of Dorian Gilmer's pain and suffering.

316.    As a direct, proximate and foreseeable result of Defendant Knight's deliberate indifference, the Estate and Survivors have suffered the injuries described below.

317.    As a direct, proximate and foreseeable result of Defendant Knight's deliberate indifference, Dorian Gilmer has suffered the injuries described below.

WHEREFORE, Plaintiffs prays that this Court grant the following relief on their civil rights claim brought pursuant to 42 U.S.C. §§ 1983 and 1988 as noted below.

## Count IV: § 1983 Fourth Amendment violation on a theory of bystander liability for failure to protect the Plaintiffs excessive force against Officers Shaw and Sasse: as to Rodney Mitchell

318.    Plaintiffs re-alleges the Common Allegations of Fact above.

319.    Defendants Shaw and Sasse were deliberately indifferent to the violation of decedent Plaintiff Mitchell right to be free from excessive force. They were aware that he had not violated any traffic laws, Defendant Shaw positioned his marked patrol vehicle in the rear of Mitchell's car, and Defendant Sasse positioned his marked patrol vehicle in front of Mitchell's car, boxing him in,

that he had complied with officer orders, and shot and killed for complying with officer's order.   Sasse and Shaw failed to take any action to prevent or discontinue the assault.

320.     The Defendant Shaw knew that fellow Sergeant Sasse was violating Rodney Mitchell's constitutional rights, he had a reasonable opportunity to prevent the harm and he choose not to act.

321.     The Defendant Sasse knew that fellow officer Shaw was violating Rodney Mitchell's constitutional rights, he had a reasonable opportunity to prevent the harm and he choose not to act.

322.     As a direct and proximate result, Mitchell's constitutional right to be free from excessive force under the Fourth Amendment was violated and they suffered conscious pain and suffering and ultimately caused Mitchell's death.

WHEREFORE, plaintiffs pray that this Court enter judgment as noted below.

### Count V: Officers Sasse and Shaw § 1983 conspiracy to violate Plaintiffs' Fourth Amendment Rights violation on a theory of bystander liability for failure to protect the Plaintiffs: as to Rodney Mitchell

323.     Plaintiff re-alleges the Common Allegations of Fact above.

324.     Officers Sasse and Shaw had an express and/or implied agreement to employ unnecessarily confrontational tactics, use unreasonable force in conducting the traffic stop, harassing Mitchell because he was African American, and place Mitchell and Gilmer in a vulnerable to be murdered when

Mitchell or Gilmer were not suspected of a crime, violation of any traffic laws, nor did they threaten the use of force against the officers.

325.     Officers Sasse and Shaw's conspiracy to violate Mitchell Fourth Amendment Rights caused the violation of Gilmer's Fourth Amendment rights and both Mitchell and Gilmer were damaged thereby.

WHEREFORE, plaintiffs pray that this Court enter judgment as noted below.

## Count VI: Intentional Torts under State Law: Wrongful Death

326.     Plaintiff re-alleges the Common Allegations of Fact as if fully set forth herein.

327.     In the alternative, Plaintiff is entitled to relief against Defendant Knight for the wrongful death of Rodney Mitchell in violation of Florida's Wrongful Death Act, Sections 768.16-768.27, Florida Statutes.

328.     The conduct of Defendants Sasse and Shaw were intentional, willful, wanton and malicious, but was not so reckless or wanting in care as to constitute disregard of human life, human rights, safety, or the property of another.

329.     At the time Defendants Sasse and Shaw initiated pursuit, Shaw claims that Mitchell was not wearing a seatbelt; Shaw or Sasse did not believe that Mitchell had committed a forcible felony as defined in Fla. Stat. Sec. 776.08.

330.     Defendant Shaw and Sasse's pursuit were not conducted pursuant to a written policy governing traffic stop procedures adopted by his employing agency.

331.     As a direct and proximate result of the wrongful acts and omissions alleged above Rodney Mitchell was killed.

332.     As a direct, proximate and foreseeable result of Defendant Knight's deliberate indifference, the Estate and Survivors have suffered the injuries described below.

WHEREFORE, Plaintiff prays for judgment as noted below.

### Count VII: Intentional Tort under State Law: Battery

333.     Plaintiff re-alleges the Common Allegations of Fact above.

334.     Alternatively, Plaintiff is entitled to relief against Defendant Knight under state law because Defendant Shaw and Sasse committed a battery on Rodney Mitchell.

335.     For purposes of this claim, Plaintiff alleges the conduct of Defendants Shaw and Sasse were intentional but not so reckless or wanting in care as to constitute disregard of human life, human rights, safety, or the property of another.

336.     The conduct of Defendants Sasse and Shaw constituted a harmful and/or offensive contact on the person of Rodney Mitchell beyond any privilege given to law enforcement officers.

337.     At the time Defendants Sasse and Shaw initiated pursuit, Shaw claims that Mitchell was not wearing a seatbelt; Shaw or Sasse did not believe that

Mitchell had committed a forcible felony as defined in Fla. Stat. Sec. 776.08.

338.    Defendant Shaw and Sasse's pursuit were not conducted pursuant to a
written policy governing traffic stop procedures adopted by his employing
agency.

339.    As a direct and proximate result of the wrongful acts and omissions
alleged above, Rodney Mitchell was killed.

340.    As a direct, proximate and foreseeable result of Defendant Knight's
deliberate indifference, the Estate and Survivors have suffered the injuries
described below.

341.    Rodney Mitchell was forced to endure great conscious pain and suffering
before his death. Rodney Mitchell filed no action during his lifetime, but under
the laws of Florida this action survives and may be asserted by his Estate under
the Survival Statute.  Plaintiff Clemons claims damages for the wrongful death
of Rodney Mitchell and for the loss of his income, services, protection, care,
assistance, society, companionship, comfort, guidance, counsel and advice, and
for funeral and burial expenses under the Florida Wrongful Death Act.

342.    The Hon. Thomas Knight is vicariously liable for the acts of Sasse and
Shaw acting within the course and scope of their employment.

343.    The acts and omissions of the officers placed Mitchell and Gilmer in
imminent danger of an unlawful touching by employing a box-in procedure,
fired shots at a person that is clearly complying with officer order, and while his

left hand was in a self-protective posture to stop, which the bullet travelled from his left hand leaving a deep gouging wound and entered his left temporal, and another bullet left an abrasion by his left eye, the car crossed over six lanes on a main highway crashing into multiple vehicles, and crashed into the front of a gas station structure, and without their consent or legal justification constitutes the tort of battery.

344.　　As a direct and proximate result of this illegal touching, Mitchell suffered great physical harm and death.

WHEREFORE, plaintiffs pray that this Court enter judgment as noted below.

## Count IX: Direct Negligence

345.　　Plaintiff re-alleges the Common Allegations of Fact above.

346.　　In the alternative, Plaintiff is entitled to relief against Defendant Knight for his direct negligence.

347.　　At the time of his death Rodney Mitchell had effectively been seized and was in the custody.

348.　　Defendant Knight had a non-delegable duty of care for Rodney Mitchell and Dorian Gilmer.

349.　　Defendant Knight was put on notice of the danger to Rodney Mitchell, Dorian Gilmer, or to other persons in like circumstances.

350.　　Defendant Knight breached his duty to Rodney Mitchell and Dorian Gilmer by the following:

a. Defendant Knight's failure to adequately train his deputies, including Defendants Sasse and Shaw, in the use of force and the use of firearms, thereby creating an atmosphere of illegal and unconstitutional behavior with respect to the use of force, with negligent disregard to the health and welfare of persons confronted by Knight's deputies;

b. Defendant Knight failed to train his officers, including Defendants Sasse and Shaw, with respect to the use of force applications which he knew that his officers were using and which posed a serious risk of personal injury including, but not limited to, the unnecessary and unreasonable use of firearms against unarmed citizens;

c. Defendant Knight failed to adequately monitor and evaluate the performance of his deputies, including Defendants Sasse and Shaw, including their use of force applications, in negligent disregard toward unarmed citizens including Rodney Mitchell and Dorian Gilmer;

d. Defendant Knight failed to adequately monitor and evaluate the appropriateness of his deputies' use of firearms in negligent disregard to the safety of unarmed citizens, including Rodney Mitchell and Dorian Gilmer; and

e. Defendant Knight had a policy, custom and practice of allowing his deputies to use excessive and unreasonable force by allowing his police officers to misuse firearms, in negligent disregard to the life and safety of

unarmed citizens, including Rodney Mitchell and Dorian Gilmer.

f. Defendant Knight had a policy, custom and practice of allowing deputies to provoke and escalate conflict with unarmed persons, in negligent disregard for the life and safety of such persons, including Rodney Mitchell and Dorian Gilmer.

351.    Defendant Knight had an obligation to make an appropriate investigation of his agents and employees and failed to do so.

352.    Defendant Knight had an obligation to properly screen, train, supervise, control, discipline, and retain his employees.

353.    As a direct and proximate cause of the aforementioned acts of defendants, both Rodney Mitchell and Dorian Gilmer suffered great physical damage, and the death of Mitchell. Mitchell estate is entitled to compensatory damages according to proof.

WHEREFORE, plaintiffs pray that this Court enter judgment as noted below.

### Count X: False Imprisonment pursuant to the Florida Tort Claims Act

354.    Plaintiff re-alleges the Common Allegations of Fact above.

355.    Alternatively, Plaintiff is entitled to relief against Defendant Knight under state law because Defendant Shaw and Sasse committed a false imprisonment on Rodney Mitchell and Dorian Gilmer.

356.    Defendants violated Plaintiffs' personal liberty by acting in a manner which had the effect of confining them against their will and limiting their

contact with anyone from the outside world.  Defendants accomplished this restraint through express and implied threats of physical force, boxing them in with their vehicles, and by acting in a manner which had the effect of threatening harm to Plaintiffs if they attempted to escape.  Plaintiffs' false imprisonment ended on June 11, 2012, when Mr. Mitchell was fatally shot dead, and when Mr. Gilmer escaped.

357.     As a proximate result of said conduct, Plaintiffs has suffered and continues to suffer bodily injury, extreme mental distress, humiliation and anguish, Post-Traumatic Stress Disorder, and other emotional and physical injures including death, as well as economic losses, all to the damage in amounts to be proven at trial.  Defendants committed the acts alleged herein maliciously, fraudulently and oppressively, with the wrongful intention of injuring Plaintiffs from an improper and evil motive, amounting to malice, and in conscious disregard of Plaintiffs' rights. Plaintiff thus is entitled to recover punitive damages from Defendants in amounts to be proven at trial.

WHEREFORE, plaintiffs pray that this Court enter judgment as noted below.

## COUNT XI: Failure to Treat in Violation of the Fourteenth Amendment Pursuant to 42 U.S.C. § 1983 against All Defendants

357. Plaintiff re-alleges the Common Allegations, as though fully set forth herein.

358. This is an action for violation of the Fourteenth Amendment to the U.S. Constitution against all Defendants.

359. Defendants, individually and cumulatively, were aware of facts that gave rise to an inference of risk of serious harm or death, and reasonably drew that inference.

360. Alternatively, Defendants employed a policy, custom, or practice that resulted in deliberate indifference to the protection of Plaintiff's Dorian Gilmer.

361. Defendants Shaw and Sasse had actual notice that Mr. Gilmer was an innocent passenger in the car and Defendant Knight had constructive notice.

362. Defendants, through the actions described above, caused Mr. Gilmer to be subjected to the deprivation of rights, privileges and immunities secured by the Constitution and the laws of the United States, including:

a. The right not to be subjected to cruel, unusual, and excessive punishment;

b. State created rights enforceable under the Fourteenth Amendment including Florida statutory protections and those fundamental rights to due process, liberty, and life guaranteed by the Constitution of the State of Florida.

363. Defendants were deliberately indifferent and recklessly disregarded to Mr. Gilmer's life.

364. As a direct, proximate and foreseeable result of the Constitutional violations as set forth above, Mr. Gilmer suffered severe physical and emotional injuries, and mental, and physical pain and suffering.

365. At all times material hereto, Defendants reasonably knew that failure to provide adequate protection would result in a substantial risk to Mr. Gilmer.

366.   Defendant Knight was and is responsible for the policies, practices, procedures, customs, and training, which govern protection of public safety in Sarasota County.

367.   At all times material hereto, the Defendants were acting in conformity with, or as a direct result of, the established policies, practices, procedures, customs, and training, of Defendant Sheriff Thomas Knight.

368.   Defendants' failures, alleged above, are attributable to the deliberately indifferent policies, practices, customs, and training, of Defendant Knight.

369.   Permitting life-threatening conditions to continue was a pervasive practice, which exhibits deliberate indifference to the serious protection of public safety.

370.   Defendants in their acts and omissions evinced

   a. subjective knowledge of a risk of serious harm;

   b. disregard of that risk;

   c. conduct that is more than mere negligence.

   Such acts and omissions constitute deliberate indifference.

371.   Defendants' reckless, callous, or deliberate indifference directly, proximately, cumulatively, and jointly and severally caused Plaintiff's damages as alleged above.

372.   Plaintiff has been forced to retain counsel to represent his to vindicate the rights of Mr. Gilmer Pursuant to the provisions of 42 U.S.C. Section 1988, Plaintiff is entitled to an award of reasonable attorney's fees and costs.

   WHEREFORE, Plaintiff prays for judgment as set forth below.

## Damages

A. The Estate of Rodney Mitchell has sustained the following damages:

1. Funeral and burial and other final expenses in the amount of $ 9,980.00, as a result of decedent's death that have become a charge against his Estate or that were paid on his behalf;

2. Loss of prospective net Estate accumulations;

3. Pain and suffering and emotional distress of Rodney Mitchell under federal law;

4. Pre- and post- judgment interest; and

5. Loss of net earnings of Rodney Mitchell from his death, with interest.

B. The Survivor of Rodney Mitchell, Channing Mitchell, sustained the following damages:

1. Loss of support and services of his father;

2. Great mental pain, anguish, and suffering from the date of injury and continuing for the remainder of his life;

3. Per- and post-judgment interest

C. Dorian Gilmer, has sustained the following damages:

1. Great mental pain, anguish, and suffering from the date of injury and continuing for the remainder of his life;

2. Pain and suffering and emotional distress under federal law;

3. Pre- and post-judgment interest

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs seeks judgment as follows:

A. Compensatory damages against each of the defendants on the federal 42 U.S.C. § 1983 claims herein;

B. Punitive damages against defendants sued individually;

C. Compensatory damages against the Hon. Thomas Knight on the federal municipal liability claim and compensatory damages under the Florida Tort Claims Act;

D. Pre-judgment interest on any economic losses and post-judgment interest;

E. Attorney's fees pursuant to 42 U.S.C. §§ 1988 and costs of litigation;

F. A trial by jury on all issues so triable;

G. Such further relief as the Court deems just and proper.

Respectfully Submitted,

s/

Sannestine Fortin
Florida Bar Number: 103028
The Fortin Law Firm
3049     Cleveland     Avenue,
Suite140
Fort Myers, Florida 33901
Phone: 239.656.1414
Fax: 1888.832.2841

OF COUNSEL

VANA RENEJUSTE, ESQ.

s/

Vana Renejuste
Florida Bar Number: 29420
Renejuste Law & Associates
3049     Cleveland     Avenue,
Suite140
Fort Myers, Florida 33901
Phone: 239.656.1414
Fax: 239.656.0646
Attorneys for Plaintiff