UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**NATASHA N. CLEMONS, as Personal Representative of the Estate of RODNEY MITCHELL and on behalf of CHANNING MITCHELL, SURVIVOR; and DORIAN GILMER,**

      **Plaintiffs,**

v.                                                             Case No.: 8:14-cv-01376-JDW-MAP

**HON. THOMAS M. KNIGHT, in both his official and individual capacity as Sheriff of Sarasota County, TROY SASSE, ADAM SHAW, both in their individual and official capacities,**

      **Defendants.**
_____/

## PRETRIAL STATEMENT

Plaintiffs, Natasha N. Clemons, as Personal Representative of the Estate of Rodney Mitchell and on behalf of Channing Mitchell, survivor, and Dorian Gilmer, (hereinafter "Plaintiffs") and Defendants Thomas Knight (hereinafter "Knight" or "Sheriff"), Troy Sasse (hereinafter "Sasse") and Adam Shaw (hereinafter "Shaw") respectfully submit this Pretrial Statement in accordance with Rule 3.06(c) of the Local Rules for the Middle District of Florida.

    **I.**    **BASIS OF FEDERAL JURISDICTION**

The Original "Federal Question" Jurisdiction of this Court was invoked pursuant to 28 U.S.C. §§ 1331. The Plaintiff's claims for relief are predicated upon 42 U.S.C. §

{12-50539-00197907.DOCX;1 }

1983, and 42 U.S.C. § 1988. Ancillary jurisdiction over the state claims is pursuant to 29 U.S.C. $ 1367.

## II.   NATURE OF THE ACTION

This is an action by the Estate of Rodney Mitchell and by Dorian Gilmer involving a use of deadly force at a traffic stop in Sarasota County, Florida. Plaintiffs maintain that Sarasota County Sheriff's Officers Adam Shaw and Troy Sasse violated the constitutional rights of Mr. Mitchell and Mr. Gilmer through the use of deadly force. Plaintiffs claim that Sheriff Thomas Knight, as Sheriff, was deliberately indifferent to the risk of harm and that he was negligent under state law. The officers deny that the constitutional rights of either Mr. Mitchell or Mr. Gilmer were violated, that there was an objectively reasonable perception of a threat to Sgt. Sasse and that the use of force was objectively reasonable. Sheriff Knight denies that he was deliberately indifferent or negligent in any respect.

## III.   GENERAL STATEMENT OF EACH PARTY'S CASE

   a. Plaintiff's Case

Plaintiffs contend that Rodney Mitchell and Dorian Gilmer were the victims of a racial profiling stop and that Deputy Adam Shaw had no factual basis to believe that Rodney Mitchell was not wearing his seatbelt. Plaintiffs contend that the officers involved in the traffic stop were officers assigned to seek contraband, not enforce traffic laws and that their purpose in stopping Mr. Mitchell was to seek an excuse to search his car for drugs or guns, based on his ethnicity. Plaintiffs contend that Mitchell pulled his car over at the closest safe, well-lit spot, within a half-block of the point he would have realized he was the target of a stop, and that

there was no reason for officers to believe he was trying to flee. Although the threatening demeanor of the officers in pointing bright spotlights on him from the front and rear of his car would have reasonably made Mr. Mitchell apprehensive, he would have been safe in the belief that he had not been involved in any traffic violations and that there was no justification for his stop. Sgt. Sasse drew his firearm when Mitchell reached down to place the Jeep in park, however, Sgt. Sasse heard Deputy Shaw order Mitchell to put the vehicle in park. Mr. Mitchell became apprehensive of the officers' aggressive behavior in pointing weapons at them when he was unarmed and following their commands. Mr. Mitchell only moved his foot from the brake to the gas after both officers started firing  Mr. Mitchell was first struck in the hand as he raised his hand in an instinctive or defensive reaction.  The bullet that penetrated Mr. Mitchell's temple first caused a defensive wound to the palm of Mr. Mitchell's hand.  Prior to and at the moment he fired, Sgt. Sasse was well to the left of the Jeep.  This position well to the left of the Jeep is consistent with Sgt. Sasse's statement to the investigator, Deputy Lefebre, that he was "at the tires" and then when he saw Mr. Mitchell's hand go down he started to "back up and disengage". At no time would a reasonable officer have believed that he or another officer or anyone else was in danger of death or serious injury. Over multiple interviews and reports, Sgt. Sasse changed his story about where he was standing again and again. In his first two interviews, less than an hour apart, Det. LeFebvre coached Sgt. Sasse to say that he was in front of the car instead of beside it.  In later reports, Sgt. Sasse said the car was accelerating toward him as he stood in front of the car although the car would

{12-50539-00197907.DOCX;1 }

have taken not more than half a second to strike him and he clearly was not struck. At some point, Sgt. Sasse says he thinks his shoulder may have been hit by the rearview mirror because he said it hurt. Later he says, "My sh – my arm is a little sore." The bullet that struck the A pillar at the front of the driver's door was fired from 25 to 30º to the left of the vehicle. Even the defendants' experts say it was 15 to 25º. That would have put Sgt. Sasse well to the left of the Jeep when he first fired, again, consistent with Sgt. Sasse's own statement. Sasse was standing beside the car when he fired the fatal shot into Rodney Mitchell's palm and temple. Sgt. Sasse would have had to fire downward over the top of the partially-closed driver's window and the bullet did, in fact, have a slightly downward trajectory through the skull. Dep. Shaw started firing when Sasse fired. Standing beside the car, he fired once into the dashboard and once into frame of rear passenger window, both shots in the general direction of both occupants of the car, spraying both Rodney Mitchell and Dorian Gilmer, as well as Sgt. Sasse with fragments of glass and lead. Rodney Mitchell would have died almost instantly but his foot remained on the accelerator and the Jeep, after brushing the right curb of Washington Court twice, angled across Washington Blvd. through six lanes of traffic and into a buttress in front of a gas station convenience store, just missing the pumps but side-swiping two cars. Several people across the street heard the shots first and then the acceleration of the Jeep and saw the Jeep move across the boulevard. When the Emergency Medical Service personnel arrived on the scene, they found Rodney Mitchell dead behind the wheel, and had to unbuckle his seatbelt to get him out of the car. The officers were inadequately

trained and supervised by the Sheriff who was well aware of the need for more and different policies and training. Dorian Gilmer, who was a child at the time of the incident, suffers from Post-Traumatic Stress Disorder. Rodney Mitchell left behind a young son with whom he had a strong bond and a mother who loved him without measure. Rodney Mitchell, in his early 20's was poised to start the career that he looked forward to as a school teacher.

**b. Defendant's Case**

Defendants contend the traffic stop of Plaintiffs was based on probable cause. Deputy Adam Shaw had an excellent view into the vehicle through an open window and could clearly see no seat belt was being worn by the driver. As Deputy Shaw was pulling over the vehicle driven by Rodney Mitchell he could see the driver moving around a lot. This action is typical of a stop for a seat belt violation as the violator will put their seat belt on after they know they are being pulled over and before the police officer comes to their window. Even if the initial traffic stop were to somehow be deemed improper, the actions of Sasse and Shaw after the stop were lawful and did not violate Mr. Mitchell's or Mr. Gilmer's rights. During the stop, Rodney Mitchell was acting strange. He would not look at Shaw or Sasse. He would not respond to Shaw's numerous commands to put the vehicle in park. With Sasse positioned near the front of Mitchell's vehicle and Shaw at or near the driver's window, Rodney Mitchell put the vehicle into park but kept his hand on the gear shift. Suddenly, Rodney Mitchell moved the vehicle back into drive and accelerated the vehicle forward very quickly. Neither Sasse nor Shaw had time to analyze Mitchell's intent. Sasse was on the

scene approximately thirty seconds before shots were fired. Mitchell's actions of accelerating the vehicle forward when he had been told to put the car in park numerous times, with Mitchell knowing Sasse was positioned at the front of the vehicle, put Sasse and Shaw in fear that Sasse was in danger of death or serious physical harm by the vehicle. As a result, both Sasse and Shaw fired to prevent Shaw from being injured or killed.  The Plaintiffs' own expert opined that the trajectory of the shots indicate Sasse was at a 25 to 30 degree angle from the front of the vehicle and within a few feet of it. Sasse did not know which direction the vehicle was going to be driven by Rodney Mitchell, just that it was headed towards him and he could have been injured or killed by the vehicle. Sasse and Shaw had only a split second to make a decision on what action needed to be taken.

These facts lead Defendants to assert that all actions taken at the subject incident were done based on probable cause or reasonable suspicion.  Defendants also assert that the Defendants are entitled to qualified immunity because their actions were in good faith did not violate clearly established law and were objectively reasonable. The Defendants assert the complaint is barred in whole or in part by the doctrine of sovereign immunity, including, but not limited to, the immunity provisions of Florida Statutes Section 768.28.  Defendants assert that in the unlikely event any liability is found against them the amount of damages that is recoverable is limited by the terms and amounts as set forth in Florida Statutes Section 768.28.  Defendants contend the Plaintiffs have failed to mitigate their damages. To the extent Plaintiff is claiming punitive damages against Defendants

in their official capacity, any such claim must be dismissed as a matter of law because such damages are not recoverable in official capacity claims under 42 U.S.C. Section 1983. Defendants contend they are entitled to qualified immunity as all actions were made in good faith and did not violate clearly established law. Defendants asserts that any claim for punitive damages arising from the state claims is barred by the provisions of Section 768.72 Florida Statute and Plaintiff is prohibited from conducting any financial worth discovery because Plaintiff has not shown a reasonable basis for a punitive damages claim. To the extent that the allegations of the Plaintiff's complaint could be construed to allow recovery on a theory of negligence, the Defendants assert the defense of comparative negligence.  Defendants assert they acted in good faith, without malicious purpose, recklessness, or in a manner exhibiting wonton and unlawful disregard of human rights, safety and property. Defendants assert they are entitled to a set off for all collateral sources paid or payable to Plaintiffs in accordance with the requirements of Section 768.76 Florida Statutes.  Defendants contend all force used by Defendants during the subject incident was objectively justifiable, necessary and reasonable in light of the facts and circumstances confronting them. Defendants contend their use of force was justifiable because Defendants reasonably believed such force was necessary to prevent death or great bodily harm to themselves. Defendants further assert the use of force was objectively reasonable and justified pursuant to Sections 776.012 and 776.032, Florida Statutes; therefore, Defendants are entitled to immunity from civil action for the use of such force and are entitled to an award of attorney's fees for defending this

matter. Defendants contend their use of force was objectively reasonable and justified pursuant to Section 776.05, Florida Statutes. The decedent physically assaulted Defendants with his vehicle while Defendants were engaged in a legal duty, when the decedent knew or should have known that Defendants were law enforcement officers, and decedent's actions were unlawful pursuant to Section 776.051, Florida Statutes. The Defendants contend the decedent's death occurred during the commission of a forcible felony against Defendants and Defendants are therefore entitled to immunity from civil action pursuant to Section 776.085, Florida Statutes. Defendants assert that to the extent damages are sought against the Sheriff individually and in his official capacity, the complaint is barred for failure to state a cause of action

## IV. EXHIBIT LISTS

   a. **Plaintiff's Exhibit List**

   Attached as Exhibit "A"

   b. **Defendant's Exhibit List**

   Attached as Exhibit "B"

   The Parties agree that all demonstrative exhibits will be available for inspection ten days prior to the start of the trial period or if a specific date for trial is known ten days from that date.

## V. WITNESS LISTS

   a. **Plaintiff's Witness List**

   Attached as Exhibit "C"

   b. **Defendant's Witness List**

   Attached as Exhibit "D"

VI. **EXPERT WITNESS LIST**

 **a. Plaintiffs Experts**

1. Melvin Tucker:

Mr. Tucker offered the opinions that if Sgt. Sasse's initial interview statement is correct: that he moved away from the vehicle to "create distance" from it on seeing Mr. Mitchell's right hand come off the steering wheel, then he would not have been in a position where the Jeep was a threat to him. The underlying offense for which Mr. Mitchell was stopped was a minor one and no one would have been at immediate risk of harm. Under those circumstances, a reasonable and well-trained officer would not have perceived a threat of immediate harm in that situation. If the witnesses across U.S. 301 are correct that the sound of the shots preceded the sound of an engine revving, and in the case of witness Torres, who also saw muzzle flashes prior to the forward movement, then the forward movement of the Jeep would not have been the cause of the shots being fired.

2. David Balash

Mr. Balash offered the opinion that the loose paint chip visible in the initial photo of the bullet defect at the A pillar was broken off in an effort to force the trajectory rods into an angle that was consistent with the SCSO version of the shooting. He opined that the actual angle of the bullet that hit the A pillar was 25-30 degrees to the left of the vehicle, which would've placed Sgt. Sasse at least 3 to 5 feet to the left of the vehicle when he fired the first shot. The location of one of Sgt. Sasse's shell casings in the grass on the other side of Washington Court is

further evidence that Sgt. Sasse was not in the zone of danger when he fired his weapon. The drawing that shows Sgt. Sasse shooting with his right hand extended out from his body is inconsistent with the modified Weaver stance demonstrated by Sgt. Sasse at his interview. The bullet that was claimed to have "possibly" hit Sasse was not a ricochet bullet and would not have followed a shallow trajectory which would've tended to place Sgt. Sasse close to the side of the car. The bullet struck at a 50-70° angle and fell to the ground an appropriate distance from Dep. Shaw's shell casings. The fact that the car was parked next to the right curb would have inhibited the quick rightward movement of the Jeep envisioned by defendants' experts. Based on the angle, it is probable that Shaw's first shot was to the cargo window and his second shot was to the rear driver side window. The evidence is inconsistent with Sgt. Sasse being in a zone of danger at the time he fired the shot that killed Rodney Mitchell.

**b. Defendants Experts**

**Retained Experts**

1. <u>Clarence Robert Chapman</u>.

Mr. Chapman is a police practices expert who will testify the use of deadly force by Sasse and Shaw was objectively reasonable, within the Sheriff's policy and guidelines, and within nationally recognized policies and training on the use of deadly force. See his report which was produced.

2. <u>Alexander Jason</u>.

Mr. Jason is a crime scene reconstruction expert who will testify the physical evidence is consistent with Sasse standing near the front of the vehicle and then

firing two shots very quickly while both he and the vehicle were moving simultaneously. Sasse's description of firing through the windshield is consistent with the point of impact with the driver's door. If positioned three feet ahead of the vehicles front bumper there would not be sufficient time for Sasse to have moved to the side to avoid being struck. The physical evidence is consistent with Sasse being very close to the vehicle as it passed him and that Sasse was struck by the second bullet fired by Shaw after it struck the rear cargo window. Sasse's first shot may have caused the driver to lift his hand from the steering wheel. The bullet strikes through the left passenger window through the dash and the bullet strike on the left cargo window are consistent with Shaw's description of the incident. Sasse and Shaw's actions are consistent with a restrained and controlled use of deadly force.  There is nothing within the physical evidence that is significantly inconsistent with Shaw and Sasse's description of the incident. See his report which was produced.

3. Chris Lawrence.

Mr. Lawrence is a force science and human factors expert. He tested various steering positions and the impact on the forward movement of the Jeep.  Using different colors of chalk, he traced the movement of the front left corner of the Jeep as it moved forward when the steering wheel was turned to 3 o'clock (green); 6 o'clock (yellow); 9 o'clock (red); and a full turn or back to the 12 o'clock (blue) position.  The results of the tracings were then photographed from beside the left front fender and again from the front left corner of the Jeep. The first test, the wheel turned at 3 o'clock, resulted in the Jeep moving nearly straight

forward. There was movement to the right, however, it was very slight. Turing the steering wheel to the 6 o'clock position, which is greater than Mr. Gilmer's estimate, moved the Jeep's front end slightly. If Mr. Gilmer was turning the steering wheel as the Jeep was moving forward, the turning capacity would be inside the red line. When the red line was created, it was based on the steering wheel being turned prior to any forward movement.

Even a full 360 degree turn of the steering wheel prior to forward movement would cause the left front corner of the Jeep fender to strike a person standing in front of the Jeep's left headlight with their feet shoulder width apart. Indeed, if a person is forward of a motor vehicle while it is accelerating, where the angle might be described as "shallow;" that is the automobile is travelling at, or perceived to be travelling at the viewer, a documented phenomenon known as "looming" will arise. When the speed of the approaching object is constant, the object grows within the visual field of the observer at a rate where, generally, the resultant visual image (and apparent proximity) of the object doubles as the distance is reduced by half. This results in a rate of growth (the number of visual angles subtended by the approaching object) that has been described as exponential, particularly as the distance closes on the viewer. When the vehicle is accelerating toward the observer, the rate of change is even more significant. Observers not in the position of the individual to which the object is approaching will not experience the same effects. Given that the object passes across their visual field rather than towards it, their perception of speed, proximity and danger

will be different than that of the observer seeing the vehicle approach. See his report which was produced.

4. <u>Donald J. Fournier</u>.

Mr. Fournier is an accident reconstruction specialist. His opinion in summary is that the reconstruction of the movement of the Jeep is consistent with the scenario of initial acceleration followed by relatively constant speed due to the foot remaining on the accelerator. The reconstruction of the movement of the Jeep shows that it was not accelerated at a high rate to the grass shoulder and then allowed to coast to the convenience store parking lot. Similarly, the Jeep did not travel at idle speed from its initial position to its final rest position.

Steering wheel inputs of 90 to 180 degrees to the right caused the center of the driver's side windshield to move 2.2 to 4.2 inches to the vehicle's right in the first three feet of travel and 4.2 to 8.5 inches to the vehicle's right in the first five feet of travel. From the onset of acceleration, the first three feet was traversed in less than 0.77 seconds and the first five feet was traversed in less than 1.0 second. The amount of lateral movement and the short travel duration would cause the Jeep to contact anyone standing in the path of the left front of the Jeep. See his report which was produced.

**Non-Retained Experts**

5. <u>William Broussard Jr., M.D., Deputy Chief Medical Examiner</u>.

Dr. Broussard will testify regarding the autopsy of Rodney Mitchell and the nature of Rodney Mitchell's injuries. His report has been produced.

a. Dr. Broussard will testify within a reasonable degree of medical probability that based on the path of the gunshot wound to Rodney Mitchell's left anterior temporal lower scalp, after he was shot, Rodney Mitchell was not capable of making a conscious movement such as, moving his foot from the brake pedal to the gas pedal or turning the steering wheel with his hands.

b. Dr. Broussard will further testify that it is more likely and consistent with Mr. Mitchell's injury that Mr. Mitchell's foot was on the gas pedal at the time he was shot.

6. <u>Bruce A. Goldberger, Ph.D., A.B.F.T.</u>

Dr. Goldberger is the chief of the division of forensic medicine and professor and director of toxicology in the Department of Pathology at the University Of Florida College Of Medicine. Dr. Goldberger is expected to testify regarding the toxicology issues in this case.

a. Dr. Goldberger will provide testimony regarding toxicological findings in this case. This includes opinions regarding the results of the testing of autopsy blood obtained from Rodney Mitchell which indicated the following:

Cannabinoids Panel, Blood:

Delta – 9 THC                 7.9 ng/mL

Delta – 9 Carboxy THC         31 ng/mL

11 – Hydroxy Delta – 9 THC    None Detected.

b. The cannabinoid results indicate recent use of cannabis by Rodney Mitchell. Use of cannabis leads to the impairment of the user's normal faculties. "Such normal faculties include but are not limited to, the ability to see, hear, walk,

talk, judge distances, drive an automobile, make judgments, act in emergencies, and in general normally perform the many mental and physical acts of daily life." F.S. 316.1934(1). Impairment of normal faculties was exemplified by Mr. Mitchell's actions on the evening of the incident preceding his death including his actions when he attempted to leave the scene of a routine traffic stop.

7. Captain John Jernigan

Captain Jernigan is an experienced narcotics officer employed by the Sarasota County Sheriff's Office. Captain Jernigan will testify regarding the conduct of Rodney Mitchell on the evening of June 11, 2012 relating to the finding of marijuana in the vehicle driven by Rodney Mitchell and the purchase of marijuana prior to the traffic stop.

Captain Jernigan will testify that:

a. The "Swisher Sweet Cigarillos" purchased by Rodney Mitchell on the evening of June 11, 2012 are commonly used as a rolling paper device to pack marijuana into for smoking and commonly referred to as a "blunt".

b. The marijuana found in the vehicle driven by Rodney Mitchell was packaged in a plastic bag in a manner commonly referred to as a "dime bag". The plastic bag contained 2.1 grams of marijuana, an amount typically sold in a dime bag. The bag used to store the marijuana was a corner piece of a plastic baggie commonly used for street sales of marijuana.

c. The conduct of Rodney Mitchell as described by Dorian Gilmer in his statement of June 22, 2012 to the Sarasota County Sheriff's Office including Rodney Mitchell arranging to meet an individual named "Riley" at the Sunoco

Station on N. Washington Blvd., purchasing Swisher Sweet Cigarillos at a convenience store, subsequently meeting Riley at the Sunoco Station for a brief period of time and the finding of 2.1 grams of marijuana in the vehicle driven by Rodney Mitchell is indicative and consistent with Rodney Mitchell purchasing the marijuana from Riley at the Sunoco Station just prior to his stop by Deputy Shaw.

d. When parties to an illegal drug sale are confronted by law enforcement following the sale of the illegal substance, the closer the stop in time to and distance to the purchase, the more likely it is the party will attempt to flee from law enforcement. In this case Rodney Mitchell was stopped by Deputy Shaw almost immediately after he left the Sunoco Station and headed north on N. Washington Blvd.

8. <u>Michael Gorn</u>

Michael Gorn is the Crime Scene Unit Supervisor for the Sarasota County Sheriff's Office. Mr. Gorn holds a master's degree in forensic science/criminalistics and is certified in advanced investigation. He will testify regarding forensic testing he performed on evidence relating to the subject incident. His report has been produced.

9. <u>Jennifer Clark</u>

Jennifer Clark is a Crime Laboratory Analyst employed by the Florida Department of Law Enforcement and will testify regarding ballistic tests she conducted relating to the subject incident. Her report has been produced.

VII. **DAMAGES**

    a. **Plaintiff:** Dorian Gilmer, emotional distress damages, $2,000,000.00; Channing Mitchell, emotional distress damages, $6,000,000.00; consortium and loss of services, $2,000,000.00; Natasha Clemons, emotional distress damages, $2,000,000.00.

    b. **Defendant – Not applicable**

VIII. **DEPOSITIONS TO BE OFFERED AS EVIDENCE AT TRIAL**

Jacarra Williams, Channing Mitchell's mother. The video of her deposition will be shown from page 1 until page 58 line 17.

The Defendants may use the entire depositions of the parties, Natasha Clemons and Dorian Gilmer.

The Defendants reserve the right to read additional portions of any depositions that are read by Plaintiffs at trial.

Plaintiffs will use the deposition of Jesus Torres and Amory Harvey

Plaintiffs may use the depositions of David Balash and Melvin Tucker in toto.

IX. **STIPULATION OF FACTS**

The incident in question occurred on June 11, 2012. During all material times, Shaw and Sasse were acting in their official capacities as law enforcement officers with the Sheriff's office and acting under color of law in the course and scope of their employment. Natasha Clemons is the mother of Rodney Mitchell and Channing Mitchell is the son of Rodney Mitchell.

X. **CONCISE STATEMENT OF APPLICABLE LAW ON WHICH THERE IS AGREEMENT**

The parties agree this Court has jurisdiction over the claims found in this suit and that venue is correct.

XI.  **CONCISE STATEMENT OF THOSE ISSUES OF FACT THAT REMAIN TO BE LITIGATED**

The facts surrounding the traffic stop and what occurred subsequently all remain to be litigated if the Defendants pending Motions for Summary Judgment are not granted. Defendants contend that there are no material facts as to liability and they are entitled to summary judgment as a matter of law.

XII.  **CONCISE STATEMENT OF THOSE ISSUES OF LAW THAT REMAIN FOR DETERMINATION BY THE COURT**

See the Defendants' Motions for Summary Judgment and the Plaintiffs' responses to the Motions for Summary Judgment.

XIII.  **CONCISE STATEMENT OF ANY DISAGREEMENT AS TO THE APPLICATION OF THE FEDERAL RULES**

None.

XIV.  **LIST OF ALL MOTIONS OR OTHER MATTERS THAT REQUIRE ACTION BY THE COURT**

1. All Defendants Motions for Summary Judgment

2. All Defendants Motions to Exclude the testimony of Plaintiffs' expert, David Balash and Melvin Tucker.

3. Any non Daubert Motions in Limine.

XV.  **OTHER ISSUES AFFECTING DISPOSITION OF THE CASE**

None.

XVI.  **CERTIFICATION**

s/Sannestine Fortin
Sannestine Fortin
The Fortin Law Firm
3049 Cleveland Ave.
Suite 140
Fort Myers, FL 33901
Telephone:  (239) 656-1414
Facsimile:  (888) 832-2841
sfortin@thefortinlawfirm.com
Attorney for Plaintiffs

s/Robert Phillips
Robert Phillips, Esq.
McGowan, Hood & Felder, LLC
1539 Health Care Dr.
Rock Hill, SC 29732
Telephone: (803) 327-7800
rphillips@mcgowanhood.com
Attorney for Natasha Clemons

 s/James Burgess
James Burgess, Esq.
BURGESS, HARRELL, MANCUSO,
OLSON & COLTON, P.A.
1776 Ringling Blvd
Sarasota FL 34236
Telephone: (941) 366-3700
Facsimile: (941) 366-0189
jburgess@burgessharrell.com
Attorney for Adam Shaw

s/James Cook
James Cook
Law Office of James Cook
314 West Jefferson St.
Tallahassee, FL 32301
Telephone: (850) 222-8080
Facsimile:  (850) 561-0836
cookjv@nettally.com
Attorney for Natasha Clemons

 s/Ralph L. Marchbank
Ralph L. Marchbank Jr., Esquire
DICKINSON & GIBBONS, P.A.
401 N Cattlemen Rd, Suite 300
Sarasota, FL  34232
Telephone: (941) 366-4680
Facsimile: (941) 953-3136
RMarchbank@dglawyers.com
Attorney for Troy Sasse

s/Frederick J. Elbrecht
Frederick J. Elbrecht
Deputy County Attorney
Office of the County Attorney
1660 Ringling Blvd, Second Floor
Sarasota, Florida 34236
Telephone:  (941) 861-7272
Facsimile:  (941) 861-7267
relbrecht@scgov.net
Attorney for Sheriff Thomas Knight

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 12th day of October, 2015, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a copy and notice of electronic filing to:

| | |
|---|---|
| Sannestine Fortin<br>The Fortin Law Firm<br>3049 Cleveland Ave.<br>Suite 140<br>Fort Myers, FL 33901<br>Telephone: (239) 656-1414<br>Facsimile: (888) 832-2841<br>sfortin@thefortinlawfirm.com | James Cook<br>Law Office of James Cook<br>314 West Jefferson St.<br>Tallahassee, FL 32301<br>Telephone: (850) 222-8080<br>Facsimile: (850) 561-0836<br>cookjv@nettally.com<br>Attorney for Natasha Clemons |
| Ralph L. Marchbank Jr., Esquire<br>DICKINSON & GIBBONS, P.A.<br>401 N Cattlemen Rd, Suite 300<br>Sarasota, FL  34232<br>Telephone: (941) 366-4680<br>Facsimile: (941) 953-3136<br>RMarchbank@dglawyers.com<br>LGordon@dglawyers.com<br>Attorney for Troy Sasse | Frederick J. Elbrecht<br>Deputy County Attorney<br>Office of the County Attorney<br>1660 Ringling Blvd, Second Floor<br>Sarasota, Florida 34236<br>Telephone:  (941) 861-7272<br>Facsimile:  (941) 861-7267<br>relbrecht@scgov.net<br>Attorney for Sheriff Thomas Knight |
| Robert Phillips, Esq.<br>McGowan, Hood & Felder, LLC<br>1539 Health Care Dr.<br>Rock Hill, SC 29732<br>Telephone: (803) 327-7800<br>rphillips@mcgowanhood.com<br>Attorney for Natasha Clemons | |

By: s/James H. Burgess, Jr.
James H. Burgess, Jr.