UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

NATASHA N. CLEMONS, as Personal
Representative of the Estate of Rodney
Mitchell, and on behalf of Channing
Mitchell, Survivor, and DORIAN GILMER,

       Plaintiffs,

v.                                  Case No: 8:14-cv-1376-T-27MAP

THOMAS M. KNIGHT, as Sheriff of
Sarasota County, and TROY SASSE and
ADAM SHAW, in their individual
capacities,

       Defendants.
_____/

## ORDER

**BEFORE THE COURT** are Defendants' motions for summary judgment (Dkts. 52, 59, 40), Plaintiffs' responses (Dkts. 70, 71, 72), and Sheriff Knight's reply (Dkt. 79). Upon consideration, and after oral argument on qualified immunity, Defendants' motions are GRANTED.

This case involves the death of Rodney Mitchell and injuries suffered by his passenger, Dorian Gilmer, after Mitchell was stopped by Deputy Adam Shaw for driving without a seatbelt. Pursuant to 42 U.S.C. § 1983, Natasha Clemons, personal representative of Mitchell's Estate, and Gilmer allege violations of Mitchell's and Gilmer's Fourth Amendment rights against the Defendants. They allege the use of excessive force by Deputies Sasse and Shaw which resulted in Mitchell's death and Gilmer's injuries (Dkt. 22, Counts I-III). Plaintiffs also assert vicarious state law battery, negligence, wrongful death, and survival claims against the Sheriff (Counts IV, V, & VII).

## I.     BACKGROUND

Just before 9:30 p.m. on June 11, 2012, Mitchell was driving northbound on U.S. 301 (Gilmer Dep. 64:9-11, 82-13-19). Gilmer, Mitchell's cousin, was in the front passenger seat (*Id.* at 63:15-16).  Deputy Shaw was southbound on U.S. 301 in a marked patrol car, stopped to make a U-turn when Mitchell passed him (Dkt. 22, ¶¶ 16-17, 18; Shaw 1 at 3).  According to Shaw, Mitchell was leaning forward in the driver's seat and he was certain that he did not have his seatbelt on (Shaw 1 at 5; Shaw 2 at 4, 9). Shaw made a U-turn to follow Mitchell (Shaw 1 at 5; Shaw 2 at 4).

Mitchell failed to stop even after Shaw hit his siren numerous times. (Shaw 1 at 6, 10). Mitchell continued on U.S. 301, made a U-turn, turned right on 29th Street, and then onto Washington Court, where he stopped at the curb facing south, keeping the car in drive (Gilmer Statement at 7-10; Shaw 1 at 6; Dkt. 22, ¶ 26). Shaw pulled in behind (Gilmer Statement at 10).

Deputy Sasse heard Shaw radio that he was going to stop a car (Sasse 2 at 3; Dkt. 22, ¶ 42; Dkt. 68-8 at 1).[1] According to Sasse, Shaw activated his emergency lights north of 29th Street, just before Mitchell turned off U.S. 301 (Dkt. 68-8 at 1). Gilmer recalls Shaw turning on his lights and siren after Mitchell made that turn (Gilmer Statement at 7-8).

Shaw exited his vehicle and approached Mitchell's driver side door (Dkt. 22, ¶ 54; Shaw 1 at 6-7). Sasse approached, stopping 10-15 feet in front of Mitchell's vehicle, facing north on the other side of Washington Court (Dkt. 22, ¶¶ 47, 60; Sasse 2 at 5-6; Shaw 1 at 6-7). Sasse exited his vehicle and approached Mitchell's vehicle (Shaw 1 at 7; Sasse 2 at 7-8; Gilmer Statement at 13). Gilmer told SCSO Investigator Mark LeFebvre that Sasse approached the front of the vehicle on the

---

[1] Sasse had worked as a deputy for eight years and was a Sergeant at the time of the incident (Dkt. 60, Sasse Aff. at ¶ 3).

driver's side near the front corner (Gilmer Statement at 13, 37, exhibit drawing). According to Gilmer, Sasse did not come to the driver's door but rather was "on the side of the vehicle and he was like closer to the front of the vehicle" (*Id.*). Sasse also reported that he was at the front, driver's side of Mitchell's vehicle, next to the tire (Sasse 1 at 7-8).

When Shaw approached Mitchell's vehicle, he couldn't see Mitchell's hands, so he ordered him numerous times to place his hands on the steering wheel, which Mitchell finally did. Shaw asked him why he didn't stop right away and for his license (Gilmer Statement at 10-11; Shaw 1 at 8, 15). Mitchell did not respond or produce his license (Gilmer Statement at 11-12; Shaw 1 at 8). Shaw was standing just behind the driver's side door, saw that Mitchell's gear shift was still in drive, and told him numerous times to "put the vehicle in park." (Shaw 1 at 8; Sasse 2 at 8; Gilmer Statement at 8, 10-11). Mitchell did not comply. (Gilmer Statement at 11-12; Shaw 1 at 8).

Sasse reported that Mitchell would not make eye contact with either deputy (Sasse 1 at 2; Sasse 2 at 8-9). Mitchell was "looking around" and appeared not to be paying attention since he was not complying with Shaw's commands (Sasse 1 at 2; Shaw 2 at 8-9). Sasse was concerned Mitchell "might be taking off" if the vehicle was still in drive (Sasse 2 at 8). Without speaking, Mitchell reached down with his right hand and shifted into park, but his hand remained on the gear shift (Shaw 1 at 8, 15; Gilmer statement at 14).

Sasse saw Mitchell take his right hand off the steering wheel and reach down to his right (Sasse 2 at 8). Mitchell still had not made eye contact with either deputy (*Id.* at 9). At this point, Sasse started to back up and disengage, drawing his firearm because he saw Mitchell take his right hand off the steering wheel and reach down, believing he could have a weapon (Sasse 2 at 8-9; Sasse 1 at 3-4). Sasse ordered Mitchell to show his hands (Sasse 2 at 9).

3

According to Shaw, after Mitchell put the vehicle in park, he ordered him to take his hand off the gear shift, but Mitchell shifted back into drive (Shaw 1 at 8; Gilmer Statement at 14). Shaw ordered him to stop and reached into the vehicle to put it in park (Shaw 1 at 9-10). As Shaw reached in, Mitchell accelerated forward (Sasse 1 at 5-6; Sasse 2 at 9-10; Shaw 1 at 9-11; Gilmer Statement at 15). Shaw saw Sasse "falling out of the way" near the front of Mitchell's vehicle (Shaw 1 at 11). Fearing that the vehicle was going to run over Sasse, Shaw drew his firearm and fired two shots (*Id.* at 11-12). According to Sasse, he was within inches of the right corner of the vehicle when Mitchell accelerated (Sasse 2 at 9-10). Thinking he would be run over, he fired two shots (*Id.* at 10-11; Sasse 1 at 3-4). The first shot hit the pillar of the driver's door, next to the windshield, and the second shot hit Mitchell. (Dkt. 48, Autopsy Report at 5). According to Sasse, if he did not fire, Mitchell could have easily turned the vehicle and hit him (Sasse 1 at 4, 10-11 ("I felt that if [Mitchell] had turned at all, I would have been, uh, pulled underneath the vehicle.")). According to Sasse, it happened so fast that he felt there was no time to do anything else (*Id.* at 6).[2]

In his statement to Investigator LeFebvre, Mitchell's passenger, Gilmer, confirmed that Mitchell took his hand off the steering wheel, put the vehicle in park, but turned the wheel to the right and put the vehicle back in drive (Gilmer Statement at 14-15; Gilmer Decl. at ¶ 6). After Mitchell turned the steering wheel, the vehicle "jerked forward," Gilmer heard gunshots, saw a flash of light to his left and ducked (Gilmer Statement at 14-16; Kresl Affidavit., Ex. B). In his statement taken eleven days after the incident with his mother, father and attorney present, Gilmer responded "Yes" when LeFebvre asked "so then, then [Mitchell] goes to take off and then that's when you

---

[2] Indeed, the time between Shaw stopping Mitchell's vehicle and his report of "shots fired" was approximately 41 seconds (*See* Dkt. 44, Jernigan Aff. at 2).

4

heard the shots?" (Gilmer Statement at 15). And Gilmer responded "Yes" when LeFebvre asked: "When he went to take off, what did, did he uhm, like was he going to take off fast to get, get away from everybody?" (*Id.*). Several months later, Gilmer wrote in a college essay that Mitchell took off and then the shots were fired (Dkt. 41, Kresl Aff., Ex. B).

After the deputies fired, Mitchell's vehicle crossed the median and traveled across U.S. 301, stopping after crashing into a structure in front of a Sunoco gas station (Dkt. 22, ¶¶ 88, 91-94; Shaw 1 at 12). When Shaw arrived at the station, Mitchell was slumped over and Gilmer was gone (Dkt. 22, ¶¶ 92-93; Shaw 1 at 12-14; Gilmer Statement at 19). Mitchell was pronounced dead at the scene.[3]

## II.   STANDARD

Under Rule 56(a), Fed. R. Civ. P., a court shall grant a motion for "summary judgment if the movant shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).   Once the movant has satisfied this burden, "[t]he burden then shifts to the nonmoving party to go beyond the pleadings and to present evidentiary materials designating specific facts that show a genuine issue." *Penaloza v. Target Corp.*, 549 Fed. App'x 844, 846 (11th Cir. 2013) (citing *Celotex*, 477 U.S. at 324).

---

[3] The autopsy showed that he sustained a gunshot wound to his head, with the entry wound at the left lower temporal scalp (Dkt. 48, Broussard Aff., Ex. B Autopsy Report at 1, 3). According to the medical examiner, the "overall pathway of the gunshot wound is left to right, slightly upward, and slightly front to back" (*Id.* at 5).   Mitchell also had a "grazing" gunshot wound on his left hand on the palmar surface (*Id.* at 1-2, 5). Gilmer suffered injuries from glass and lead shrapnel (Dkt. 50, Gilmer Dep. at 155:13-156:5).

In deciding a motion for summary judgment based on qualified immunity, all issues of material fact are to be resolved in favor of the plaintiff, thereby eliminating all factual issues. *See Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002).[4] The facts are viewed in the light most favorable to the plaintiff because the legal issue of qualified immunity on summary judgment is "not which facts the parties might be able to prove, but, rather, whether or not certain given facts showed a violation of clearly established law." *Id.* (quoting *Sheth v. Webster*, 145 F.3d 1231, 1236 (11th Cir. 1998)).

## III.    DISCUSSION

### A.    § 1983 Claims

In Count I, pursuant to 42 U.S.C. § 1983, Plaintiffs allege that Sasse and Shaw unnecessarily used deadly force in violation of the Fourth Amendment. In Count III, pursuant to § 1983, Plaintiffs allege that Defendants violated Mitchell and Gilmer's Fourth and Fourteenth Amendment rights to be free from unreasonable searches and seizures and the right to be free from the use of excessive and unreasonable force in the course of a search and seizure. In their summary judgment motions, Defendants contend Sasse and Shaw are entitled to qualified immunity and that as a result, Plaintiffs' § 1983 claim against the Sheriff fails.

#### Qualified immunity

"Under the doctrine of qualified immunity, government officials acting within their discretionary authority are immune from suit unless the official's conduct violates clearly established

---

[4] *Robinson v. Arrugueta*, 415 F.3d 1252, 1257 (11th Cir. 2005) ("By approaching the record in this way, the court has the plaintiff's best case before it. With the plaintiff's best case in hand, the court is able to move to the question of whether the defendant committed the constitutional violation alleged in the complaint without having to assess any facts in dispute. Thus, . . . material issues of disputed fact are not a factor in the court's analysis of qualified immunity and cannot foreclose the grant or denial of summary judgment based on qualified immunity.").

federal statutory or constitutional rights of which a reasonable person would have known." *Wilkerson v. Seymour*, 736 F.3d 974, 977 (11th Cir. 2013) (quoting *Keating v. City of Miami*, 598 F.3d 753, 762 (11th Cir. 2010)). For a plaintiff to avoid summary judgment on qualified immunity, the facts, taken in the light most favorable to the plaintiff, must demonstrate (1) a constitutional violation and (2) that the violation was clearly established. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001) (abrogated in part by *Pearson v. Callahan*, 555 U.S. 223 (2009)); *Robinson*, 415 F.3d at 1255.

Plaintiffs do not dispute that Sasse and Shaw were acting within the scope of their discretionary authority as law enforcement officers (*see* Dkt. 22, ¶¶ 11-12). Accordingly, the burden shifts to them to show that qualified immunity is inapplicable. *Corey Airport Servs., Inc. v. Decosta*, 587 F.3d 1280, 1285 (11th Cir. 2009).

Plaintiffs contend that the deputies' use of deadly force constituted excessive force in violation of the Fourth Amendment. Their claims are accordingly analyzed under the Fourth Amendment's "objective reasonableness" standard. *Terrell v. Smith*, 668 F.3d 1244, 1250 (11th Cir. 2012) (quoting *Graham v. Connor*, 490 U.S. 386, 388 (1989)); *Crosby v. Monroe County*, 394 F.3d 1328, 1333 (11th Cir. 2004) ("[T]he 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officer's actions are 'objectively reasonable' in light of the facts and circumstances confronting him, without regard to his underlying intent or motivation.").

An officer is entitled to qualified immunity if an objectively reasonable officer in the same situation could have believed that the force used was not excessive. *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002). Although the facts must be taken in the light most favorable to Plaintiffs, the determination of reasonableness must be made from the perspective of the officers "on the scene with knowledge of the attendant circumstances and facts." *Terrell*, 668 F.3d at 1250;

7

*Robinson*, 415 F.3d 1255. The officer's conduct is judged "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Terrell*, 668 F.3d at 1250. "This is so because 'police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'"*Id.* As the Supreme Court has explained, the "standard of reasonableness at the moment applies: Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Graham*, 490 U.S. at 396-97 (internal citation and quotation omitted).

### When use of deadly force is justified

Generally, the use of deadly force is reasonable when an officer "has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). More specifically, with regard to the use of deadly force in this case, this Circuit has ". . . consistently upheld an officer's use of force and granted qualified immunity in cases where the decedent used or threatened to use his car as a weapon to endanger officers or civilians immediately preceding the officer's use of deadly force." *Terrell*, 668 F.3d at 1256 (quoting *McCullough v. Antolini*, 559 F.3d 1201, 1207 (11th Cir. 2009)); *Robinson*, 415 F.3d at 1256 (when an individual is stopped for a traffic violation, "it is constitutionally permissible for an officer to use deadly force when he has probable cause to believe that his own life is in peril"). Circuit precedent applying qualified immunity in analogous circumstances is instructive.

In *Robinson*, as noted in *Terrell*, the officer's use of deadly force was found reasonable under the Fourth Amendment where he was positioned between two vehicles in a two to four foot gap and the suspect began to move his vehicle towards the officer "at a likely speed of around one to two

8

miles per hour." *Robinson*, 415 F.3d at 1254. The officer "had to make a split-second decision of whether he could escape before he got crushed." *Id.* at 1256. As that court explained:

> Here, Arrugueta was standing in a narrow space between the two vehicles, Walters was disobeying Arrugueta's orders to put his hands up, the Escort was suddenly moving forward and Arrugueta had to make a split-second decision of whether he could escape before he got crushed.

*Robinson*, 415 F.3d at 1256.

### Sasse's use of deadly force

The reasonableness of the use of deadly force in this case therefore turns on whether a reasonable officer could have perceived that Mitchell's vehicle was being used as a deadly weapon which posed an immediate and serious threat to Sasse's safety. The undisputed facts, taken in the light most favorable to Plaintiffs, demonstrate that a reasonable officer could have perceived that Mitchell was using or threatening to use his vehicle as a deadly weapon, subjecting Sasse to a risk of serious physical harm, and that the decision to use deadly force was justified.

Like the suspect in *McCullough*, from the beginning of the stop, Mitchell was non-compliant.[5] He failed to immediately pull over, making two turns before doing so. He was ordered several times to put his hands on the steering wheel before finally complying, and was not paying attention to or making eye contact with either deputy. Shaw ordered Mitchell several times to shift his vehicle into park before Mitchell moved his right hand from the steering wheel. When Mitchell moved his right hand down, Sasse drew his firearm, pointed it at Mitchell, and began to back up and disengage, believing he might have a weapon. At the same time, despite having been ordered by Shaw to take his right hand off the gear shift, Mitchell shifted into drive. Shaw ordered Mitchell to

---

[5] *McCullough*, 559 F.3d at 1203 (suspect refused to show his hands or reply at all to the officer's commands).

stop and tried to reach inside Mitchell's vehicle to put the vehicle in park.  Like the suspect in

*Terrell*, Mitchell refused to heed Shaw's command to stop the vehicle.[6]

Viewing the facts in a light most favorable to Plaintiffs, Sasse was near the front driver's side

corner of the jeep, somewhere between 3 to 5 feet away, when Mitchell suddenly accelerated. Sasse

believed Mitchell's vehicle would hit him if it turned at all, and fired two shots at Mitchell. Shaw,

also believing that Mitchell's vehicle would hit Sasse, fired two shots toward the vehicle. Only 41

seconds elapsed between Mitchell stopping and the deputies firing.[7]

In sum, the undisputed facts demonstrate that Sasse was close to the driver's side front

bumper when Mitchell suddenly accelerated, requiring the deputies to make split second

determinations of whether to fire their weapons. Given these circumstances and Mitchell's non-

compliance throughout the stop, which lasted less than a minute, an objectively reasonable law

enforcement officer could have perceived that Mitchell's vehicle was being used as a deadly weapon

and posed a serious threat of physical harm to Sasse. Use of deadly force was therefore reasonable.

To the extent Plaintiffs contend that issues of fact preclude summary judgment on the

---

[6] *Terrell*, 668 F.3d at 1255 ("Zylstra refused to heed Smith's commands to stop the vehicle and turned the car 'in a dangerous and aggressive manner which provided the officers with probable cause to believe that [Zylstra] . . . posed a threat of serious physical harm or death to the officers . . . especially in light of the speed with which the incident unfolded.'").

[7] Although Gilmer testified that Mitchell had the steering wheel turned to the right, away from Sasse, there is no indication that Sasse knew this and it does not change the fact that the deputies could have perceived that Mitchell's vehicle was being used as a deadly weapon when it accelerated in such close proximity to Sasse. *See Johnson v. Niehus*, 491 Fed. App'x 945, 953 (11th Cir. 2012) ("That Johnson's vehicle had already started to pull past Niehus at the time he fired is of no consequence to this analysis. Even if in hindsight the facts show that the officer perhaps could have escaped unharmed, an objectively reasonable law enforcement officer could well have perceived that Johnson's vehicle was being used as a deadly weapon, especially after the driver had been repeatedly ordered to stop.").

question of qualified immunity, they are mistaken.[8] Plaintiffs contend that there are two material

factual issues as to whether it was reasonable for the deputies to believe that Sasse could be hit by

Mitchell's vehicle: (1) whether Mitchell's vehicle moved before the shots were fired, and (2) Sasse's

position in relation to Mitchell's vehicle when the deputies fired (*See* Dkt. 68-22, Matrix of Disputes

of Material Facts).[9]

### Whether Mitchell's vehicle moved before the shots

---

[8] As the Supreme Court has cautioned, "[t]o deny summary judgment any time a material issue of fact remains on the excessive force claim-could undermine the goal of qualified immunity to 'avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment.'" *Saucier*, 533 U.S. at 202 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, (1982)); *Robinson*, 415 F.3d at 1257. ("Thus, because material issues of disputed fact are not a factor in the court's analysis of qualified immunity and cannot foreclose the grant or denial of summary judgment based on qualified immunity; we decline to entertain Robinson's arguments concerning the allegedly disputed facts.").

[9] Plaintiffs initially argue that Shaw did not have probable cause to stop Mitchell for not wearing his seatbelt (*see* Dkt. 71 at 2). Plaintiffs state that Shaw's "quick, nighttime observation of what he perceived to [be] a driver's odd posture in his vehicle" [was] not based on recognized objective criteria for probable cause for a seat belt violation" (*Id*.). Plaintiffs' contention is without arguable merit.

"[A]traffic stop is a constitutional detention if it is justified by reasonable suspicion under [*Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)] or probable cause to believe a traffic violation has occurred under *Whren v. United States*, 517 U.S. 806, 810, 116 S.Ct. 1769, 1772, 135 L.Ed.2d 89 (1996)." *United States v. Chanthasouxat*, 342 F.3d 1271, 1275 (11th Cir. 2003) (emphasis added). The touchstone of either inquiry is reasonableness. *Id.* Under Florida Statutes, section 316.614, it is unlawful to operate a motor vehicle without wearing a seat belt. According to Shaw, he observed Mitchell leaning forward in the driver's seat when Mitchell passed Shaw going the opposite direction in the lane closest to Shaw, and could see that he was not wearing a seatbelt because the window was halfway down (Shaw 1 at 4-5; Shaw 2 at 4). Once Shaw was behind Mitchell, he could see him moving around inside the vehicle (*Id.* at 6). In his experience, it was common for persons not wearing seatbelts to put them on after being notified they were being pulled over (*Id.* at 8-9).

Shaw had a good view into the driver's side window and was "100% sure" no seatbelt was being worn by the driver (Shaw 1 at 5; Shaw 2 at 9). Plainly, Shaw was justified in effecting a traffic stop under Florida law based on his observations that Mitchell was not belted. *Terrell*, 668 F.3d at 1252 ("Officer Smith plainly was justified under Florida law in stopping Zylstra's vehicle in order to write a traffic citation for driving at night without lit headlights.") (citing *Cresswell v. State*, 564 So. 2d 480, 481 (Fla. 1990) ("The initial stop was valid because a law enforcement officer is clearly entitled to stop a vehicle for a traffic violation.")).

That Gilmer subsequently stated (Gilmer Decl. at ¶ 7) that Mitchell was belted does not change Shaw's initial perception, since an officer's motive in effecting a stop does not invalidate what is otherwise "objectively justifiable behavior under the Fourth Amendment." *Warren v. United States*, 517 U.S. 806, 812 (1996). And even if Shaw may have been mistaken, that "will not vitiate probable cause to support the traffic stop" so long as his belief was reasonable. *United States v. Maxwell*, 141 Fed. App'x 878, 881 (11th Cir. 2005); *see also Chanthasouxat*, 342 F.3d at 1276 ("A traffic stop based on an officer's incorrect but reasonable assessment of facts does not violate the Fourth Amendment"). And in effecting the stop, Shaw clearly was permitted to ask Mitchell for identification. *Terrell*, 668 F.3d at 1252 (citing *United States v. Powell*, 236 F.3d 1274, 1278 (11th Cir. 2001) (officer conducting traffic stop is permitted to investigate the driver's license and registration)).

Even viewing the facts in Plaintiffs' favor, there is no evidence to support Plaintiffs' contention that Mitchell's vehicle did not move prior to the shots being fired. According to Sasse and Shaw, Mitchell's vehicle accelerated before they fired. And Gilmer told the Sheriff's investigators that Mitchell's vehicle moved before shots were fired (Dkt. 56-7). He also wrote in a subsequent college essay that Mitchell accelerated before the deputies fired (Dkt. 41 at 7).

Plaintiffs contend that the statements of witnesses who were across U.S. 301 at the time of the shooting indicate otherwise. A careful review of those statements, however, demonstrates that these witnesses could not say one way or the other whether Mitchell's vehicle moved before the shots (See Dkts. 56-6, 56-8, 56-9, 56-10). With the exception of Torres, none of the witnesses testified about what happened *before* they heard the shots.

Although Torres observed the stop from some distance, a careful review of his deposition testimony demonstrates that he is unable to say whether Mitchell's vehicle moved before the shots. His testimony is too equivocal to create a disputed issue of fact. (Dkt. 51, Torres Dep. at 24:25-25:18-25; 1-6; 27:21-29:1; 28:19-25).[10] Accordingly, Torres' testimony does not create a *material*

---

[10] Torres did answer "Yes" to the question: "At the moment that the shots were fired, was the Jeep standing still?" (Dkt. 51, at 27:21-25). However, his testimony was equivocal on that point. As noted, he admitted that he was not sure whether the Jeep moved before the shots, and in follow up examination, admitted that he cannot recall with certainty whether the Jeep moved before shots were fired (*Id.* at 29: 22-24)("But I never saw whether he moved or did not move. . . before the shots").

Moreover, Torres' ability to observe and recall accurately the events about which he testified is undisputably poor. For example, he incredibly testified that the *driver of the vehicle being stopped* fired twice as the officer approached and that the officers "never shot" (Dkt. 51, Torres Dep.at 11:8-11;: 19-20)("Once the police officers got out of the vehicle and they were going towards the driver of their vehicle, that's when the driver pulled out the gun and shot off two -- shot the gun twice. . . And did the shots that you heard and saw come out of the driver's side of the Jeep?"... "Yes."). According to Torres, the officers "never shot." (*Id.* at 27: 16). He also testified that the second police vehicle arrived "when I heard the shots," and that 'the car was already moving" (*Id.* at 23: 16-22). His version of the events cannot be reconciled with the undisputed facts.

Since Torres' testimony is blatantly contradicted by the record, no reasonable jury could believe it, and it therefore cannot prevent summary judgment. *See Singletary v. Vargas*, No. 14-14424, 2015 WL 6533367, at *8 (11th Cir. Oct. 29, 2015) (when version of events is blatantly contradicted by the record, so that no reasonable jury could believe it, that version cannot be accepted for purposes of summary judgment and therefore ambiguous testimony does not create a material dispute as to the officer's location or sequence of events); *Johnson*, 491 Fed. App'x at 950 (where

factual issue. *See Riordan v. O'Shea*, 448 Fed. App'x 928, 930 n.2 (11th Cir. 2011) (where witness' testimony is too equivocal or the witness cannot recall one way or the other, testimony does not create a disputed issue of fact).

### Sasse's position relative to the vehicle

Plaintiffs contend that Sasse's position relative to Mitchell's vehicle could not have led the deputies to reasonably believe he was in danger when Mitchell suddenly accelerated. Plaintiffs rely on their experts, David Balash and Melvin Tucker, who opine that Sasse was not in danger of being struck by Mitchell's vehicle. (Dkt. 49-1 at 15; Dkt. 54-2 at 75-82).[11] Considered in the context of whether a reasonable officer could have perceived that Mitchell's vehicle posed a danger to Sasse when it suddenly accelerated, those opinions do not create a disputed issue of fact.

Balash, based on his estimate of the angle of trajectory of the shots fired by Sasse, 25 to 30 degrees, opines that "Sasse would have been at least 3 to 5 feet, or further, to the left of the Jeep's left front fender and in no danger of being struck by this vehicle" (Dkt. 49-1 at 9).[12] However, he conceded that it is within the range of his opinion that Sasse could have been as close as 3 feet, 11 inches from Mitchell's vehicle when he fired (Dkt. 49, Balash Dep. at 72:17-25). Tucker could not determine how far Sasse was from Mitchell's vehicle when he fired his weapon (Dkt. 54, Melvin

---

account given by plaintiff could not be reconciled with conclusions drawn from physical evidence at the scene, which corroborated the officers' accounts of what happened, plaintiff's account was disregarded); *Kesinger ex rel. Estate of Kesinger v. Herrington*, 381 F.3d 1243, 1249 (11th Cir. 2004) (where eyewitness' testimony conflicts with the unanimous testimony of other eyewitnesses and is contradicted by the physical evidence, it was properly disregarded).

[11] Defendants have moved to exclude Balash's and Tucker's expert opinions (Dkts. 57, 58).

[12] Balash relies on the location of bullet casings and his analysis of the angle of bullet hole in the A Pillar, which he estimated to be between 25 and 30 degrees. Defendants' expert, Alexander Jason, estimated the angle of the strike into the A Pillar to be 15 to 25 degrees (Dkt. 42 at 25). An angle of 0 degrees would mean the shot came from directly in front of the vehicle, while an angle of 90 degrees would mean the shot came directly from the side of the vehicle. (Dkt. 42 at 24; Balash Dep. at 76:21-77:3). Balash testified that an angle of 25 degrees would mean the shot came from more towards the front of the vehicle than the side (Balash Dep. at 77:4-6).

Tucker Dep. at 64:17-22).  And he acknowledges that Sasse "was standing by the driver's side front tire" (*Id.* at 78).

These expert opinions do not raise a genuine issue of material fact when considered against the observations of the eye witnesses and the split second decisions Sasse and Shaw were forced to make when Mitchell's vehicle suddenly accelerated. Sasse, Shaw, and Gilmer all place Sasse at the front of the driver's side of Mitchell's vehicle, near the tire and bumper. Plaintiffs concede that Gilmer "agrees with Sasse that he was 'on the side of the vehicle and he was like closer to the front'" (Dkt. 70 at 8-9 (quoting Gilmer Statement at 13)).

Balash's and Tucker's conclusory opinions that Sasse was not in danger of being hit by Mitchell's vehicle are contradicted by these undisputed facts. And to the extent those opinions imply or raise an arguable inference that Sasse's use of deadly force was excessive, that is not the proper subject of expert testimony. *Myers v. Bowman*, 713 F.3d 1319, 1328 (11th Cir. 2013) (whether use of force is excessive "is not a matter subject to expert testimony") (quoting *Freund v. Butterworth*, 165 F.3d 839, 863 n.34 (11th Cir. 1999)). At the summary judgment stage, once the relevant facts are determined and all reasonable inferences are drawn in favor of the nonmoving party, the reasonableness of Sasse's actions "is a pure question of law." *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007); *Myers*, 713 F.3d at 1328.

Finally, Balash's and Tucker's conclusions amount to no more than hindsight opinions that Sasse was not in danger of being struck by the vehicle because he could have avoided any perceived danger. Circuit precedent instructs, however, that the deputies' actions must be viewed from the perspective of a reasonable officer on the scene, rather than with 20/20 hindsight. *Terrell*, 668 F.3d

at 1256.[13] This Circuit has cautioned that the determination of whether a reasonable officer could have perceived that a vehicle was being used as a deadly weapon is determined in light of the facts and circumstances confronting the officer at the time, even if in hindsight the facts demonstrate that the officer could have escaped unharmed. *Id.*

Plaintiffs also argue that Sasse provided inconsistent versions of his exact location at various times. Notwithstanding, it remains undisputed that he was at or near the front left bumper of Mitchell's vehicle when it accelerated and he fired. To the extent Sasse's statements include arguable inconsistencies as to his precise location at various times, those inconsistencies do not raise a *genuine* dispute with regard to the reasonableness of Sasse's actions, the "pure question of law" to be decided on summary judgment.[14] "At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott*, 550 U.S. at 372, *citing* Rule 56(c).

The undisputed material facts demonstrate that Sasse was near the front left bumper of Mitchell's vehicle, as close as three feet and inches, when it suddenly accelerated. From a reasonable officer's perspective, Sasse's proximity to the front of Mitchell's vehicle placed him in danger. Defendants' undisputed factual assertions are therefore accepted for purposes of summary judgment, since Plaintiffs have not contradicted them. *See Singletary*, 2015 WL 6533367, at *9 ("However, we

---

[13] As has been explained, "[o]ur precedent instructs us to take into account that '[r]econsideration [after the uncertainty and the excitement of the moment have passed] will nearly always reveal that something different could have been done if ... the future [was known] before it occurred.'" *Carr v. Tatangelo*, 338 F.3d 1259, 1270 (11th Cir. 2003); *Robinson*, 415 F.3d at 1256 ("Even if in hindsight the facts show that Arrugueta perhaps could have escaped unharmed, we conclude that a reasonable officer could have perceived that Walters was using the Escort as a deadly weapon. Arrugueta had probable cause to believe that Walters posed a threat of serious physical harm.").

[14] *Holmes v. Kucynda*, 321 F.3d 1069 (11th Cir. 2003) and *Kingsland v. City of Miami*, 382 F.3d 1220 (11th Cir. 2004) are distinguishable. In both cases, a question arose as to whether the officers' statements supporting their arrests were "deliberately false" or "recklessly false." No such question exists here.

15

accept Defendant's factual assertions when they are based on undisputed evidence and have not been contradicted by Plaintiff").

### Objective Reasonableness

As noted, the circumstances confronting Sasse and Shaw required split second reactions to Mitchell's actions. Consistent with Circuit precedent, use of deadly force in this case was justified. *See Terrell*, 668 F.3d at 1253; *McCullough*, 559 F.3d at 1202 (use of deadly force justified where "in a split-second situation where a suspect late at night refused to pull over, engaged in a high-speed chase, and then, after pulling over, repeatedly refused to show his hands or respond to officers, revved his engine, and then drove his truck toward the deputy standing in a nearby lot"); *Troupe v. Sarasota County., Fla.*, 419 F.3d 1160, 1168 (11th Cir. 2005) (a reasonable officer could have perceived the decedent posed a threat of serious physical harm where the officer was directly in the decedent's path as his car accelerated toward the officer who had only 3-5 seconds to assess the situation before shooting); *Robinson*, 415 F.3d at 1255-56 (officer entitled to qualified immunity where officer used deadly force against suspect driving a vehicle that was advancing towards officer at one to two miles per hour); *Johnson*, 491 Fed. App'x at 952-53 (use of deadly force objectively reasonable where driver ignored repeated commands by the officers, tried to roll up the windows while the officers were in harm's way, revved the engine and threw the vehicle into reverse while the officers' arms and hands were in the vehicle, in attempting to flee); *Long v. Slaton*, 508 F.3d 576, 581 (11th Cir. 2007) (use of deadly force reasonable to prevent the decedent from fleeing in a stolen police cruiser); *Pace v. Capobianco*, 283 F.3d 1275, 1282 (11th Cir. 2002) (deadly force constitutional where the decedent would have appeared to have been gravely dangerous based on his hazardous driving during a vehicle chase, and failure to heed police warning).

16

From the perspective of an objectively reasonable officer in the same situation, with only seconds to react, Sasse and Shaw could have believed that Mitchell's accelerating vehicle posed a risk of serious physical harm to Sasse and that the use of deadly force was justified. Accordingly, Plaintiffs have failed to establish a constitutional violation and Sasse and Shaw are entitled to qualified immunity.

### Constitutional right was not clearly established

Because Plaintiffs have not demonstrated a constitutional violation, it is unnecessary to determine whether the constitutional right was clearly established. *See Saucier*, 533 U.S. at 201 ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity"). Notwithstanding, Plaintiffs fail to demonstrate that the claimed constitutional right was clearly established.

In determining whether a right is clearly established, the relevant inquiry is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation with which he was confronted. *Saucier*, 533 U.S. at 202. If not, summary judgment based on qualified immunity is appropriate. *Id.* Plaintiffs can demonstrate that the right was clearly established in several ways. "First, the plaintiffs may show that a materially similar case has already been decided. Second, the plaintiffs can point to a broader, clearly established principle that should control the novel facts of the situation. Finally, the conduct involved in the case may so obviously violate the constitution that prior case law is unnecessary." *Terrell*, 668 F.3d at 1255.

The established law at the time of this incident, as discussed, supports the opposite conclusion than that urged by Plaintiffs. As noted, an officer's use of force has been consistently upheld "in cases where the decedent used or threatened to use his vehicle as a weapon to endanger

officers or civilians immediately preceding the officer's use of deadly force." *Terrell*, 668 F.3d at 1256 (citing cases).[15]

### B.   Claims Against Sheriff Knight[16]

#### § 1983 Claims

In the absence of a constitutional violation by his deputies, the claims against the Sheriff fail. Because the deputies did not violate Mitchell's or Gilmer's constitutional rights, there is no basis for municipal liability under § 1983. *Clark v. City of Atlanta, Ga.*, 544 Fed. App'x 848, 857 (11th Cir. 2013) (citing *Rooney v. Watson*, 101 F.3d 1378, 1381 (11th Cir. 1996) ("[A]n inquiry into a governmental entity's custom or policy is relevant only when a constitutional deprivation has occurred.")); *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998) (explaining that there are only "limited circumstances" in which an allegation of a failure to train or supervise can be the basis for liability under § 1983 and that they "occur only where the municipality inadequately trains or supervises its employees, this failure to train or supervise is a city policy, and that city policy *causes the employees to violate a citizen's constitutional rights*.") (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 387 (1989) (emphasis added)).

#### Vicarious Liability for State Law Claims

Defendant Knight moves for summary judgment on Plaintiffs' state law claims, contending that because the deputies' use of force was objectively reasonable, there is no liability to impute to the him. A battery claim for excessive force depends on whether the amount of force used was

---

[15] Shaw also contends that it is undisputed that the shots he fired did not hit Mitchell or Gilmer and as a result, his actions were not the proximate cause of Mitchell's death or Gilmer's injuries. This issue need not be reached in light of the conclusion that Shaw is entitled to qualified immunity.

[16] Plaintiffs dismissed their claims against Sheriff Knight in his individual capacity (Dkts. 30, 31).

18

reasonable under the circumstances. *City of Miami v. Sanders*, 672 So. 2d 46, 47 (Fla. 3d DCA 1996) (citing *Dixon v. State*, 101 Fla. 840, 132 So. 684 (1931)). As discussed, Sasse and Shaw's use of force was objectively reasonable, and this claim therefore fails.

Florida's Wrongful Death Act allows recovery when the death of a person is caused by, *inter alia*, negligence or a "wrongful act." Fla. Stat. § 768.19. Courts have construed "wrongful act" to include the use of excessive force by a police officer. *See Kimbrough v. City of Cocoa*, No. 6:05CV471 ORL31KRS, 2006 WL 3335066, at *8 (M.D. Fla. Nov. 16, 2006); *Vaughn v. City Orlando*, No. 6:07-CV-1695-ORL-19G, 2009 WL 3241801, at *8 (M.D. Fla. Sept. 29, 2009), *aff'd sub nom., Vaughn v. City of Orlando*, 413 Fed. App'x 175 (11th Cir. 2011)).

As noted, Plaintiffs' claim for battery turns on whether the amount of force used was reasonable. Because the deputies' use of force was reasonable, it cannot be said that Mitchell's death was caused by a wrongful act.[17] Plaintiffs make no attempt to argue otherwise as to any of their state law claims (*see* Dkt. 70 at 20 ("If a jury could reasonably find Mitchell was wrongfully killed, the Sheriff is liable . . . .")).

Accordingly,

1.     Defendants' motions for summary judgment (Dkts. 52, 59, 40) are **GRANTED**.

2.     Plaintiffs' Motion for Leave to File A Surreply to Defendant Knight's Reply to Plaintiffs' Response to Motion for Summary Judgment (Dkt. 85) is **DENIED** *as moot*.

---

[17] Plaintiffs' alternative survival claim (Count VII) is predicated on the allegation that Defendants' wrongful acts and omissions did not cause the death of Mitchell. This claim fails for the same reasons Plaintiffs' wrongful death claims fails as it arises out of the same alleged conduct as the wrongful death claim. *See* Fla. Stat. § 46.021. In addition, Plaintiffs argue that their alternative direct negligence claim (Count VI) survives because the Sheriff would be liable "[i]f a jury could reasonably find Mitchell was wrongfully killed." (Dkt. 70 at 20). This claim is essentially the same as their § 1983 claim against the Sheriff and fails for the same reasons their other claims fail: the deputies' use of force was reasonable.

19

3.     Defendants' Joint Motion to Exclude Expert Opinion Testimony of David Balash (Dkt. 57) is **DENIED** *as moot*.

4.     The *Daubert* Motion of Defendants, Hon. Thomas M. Knight, Troy Sasse, and Adam Shaw, to Exclude Expert Opinion Testimony of Melvin Tucker (Dkt. 58) is **DENIED** *as moot*.

5.     All motions *in limine* (Dkts. 90, 91, 98, 99, 100, 101, 102, 103, 104, 108) are **DENIED** *as moot*.

6.     The Clerk is directed to **ENTER FINAL JUDGMENT** in favor of Defendants and against Plaintiffs and **CLOSE** the file.

**DONE AND ORDERED** this _19th_ day of November, 2015.

JAMES D. WHITTEMORE
United States District Judge

Copies to:
Counsel of Record